**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Tommie Louis BROWN, Defendant-
Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Virgil David SWAIN, Defendant-
Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert Lee NOBLES, Defendant-
Appellant.**

**Nos. 73–2279, 73–2678, 73–2280.**

United States Court of Appeals,
Ninth Circuit.

June 10, 1974.

Darrell McIntyre, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

Nicholas R. Allis, Deputy Public Defender (argued), Los Angeles, Cal., for Robert L. Nobles.

Stanley P. Berg (argued), Beverly Hills, Cal., for Virgil D. Swain.

Bruce E. Krell (argued), San Francisco, Cal., for Tommie L. Brown.

Before ELY and KILKENNY, Circuit Judges, and ENRIGHT, District Judge.*

ENRIGHT, District Judge:

In late morning on February 6, 1973, four men robbed a Crocker National Bank in Los Angeles. Three men were brought to trial in April, 1973, for the offense: defendants Tommie Louis Brown, Robert Lee Nobles, and Virgil David Swain. The fourth man, whose name appeared on the indictment as Jonathan Ray Nobles, was a fugitive at time of trial.

The government's theory was that Brown jumped behind the tellers' windows and moved down the line of cages, collecting money from the cash drawers, while the other three guarded the customers and personnel from various positions. A surveillance camera took pictures of all the participants except the one who stood beneath the camera, allegedly defendant Nobles [hereinafter Nobles].

### I. The Brown and Swain Appeals

The evidence against Brown and Swain was similar and consisted of surveillance photographs, items taken from the apartment they shared, a comparison of photographs, eyewitness identifications, and a statement by Brown.

Defendants Brown and Swain primarily attack the comparison of certain photographs. One group of photographs, consisting of enlarged surveillance pictures showing the faces and clothing of the two robbers alleged to be Brown and Swain, were placed on a chart next to a second group of photographs consisting of enlarged police pictures of Brown and Swain as well as FBI photographs of the items of clothing seized from their apartment. An FBI expert in photographic identification, Frederick E. Webb, compared the two groups of photographs and stated that the faces in the police photographs were the same faces as those in the surveillance photographs.

He also testified that the clothing in the two groups of photographs was the same, and further, he made a similar analysis of a surveillance photograph of a pistol used in the robbery and a FBI photograph of the handgun seized in the apartment.

When Mr. Webb, in response to the prosecutor's questions, began to state his opinion that Brown and Swain were indeed two of the three pictured on the surveillance film, the district court overruled the defense objection but not without some misgiving:

I must say in my own personal opinion it comes very, very close to impinging upon the province of the jury . . . . that case [United States v. Cairns, 434 F.2d 643 (9th Cir. 1970)] I suggest to you, Mrs. Broady, which seems to authorize this very procedure.

Reporter's Transcript [hereinafter R.T.] 260, lines 5–11. We too are troubled by the proffered testimony.

In *Cairns*, this circuit previously wrote:

Appellant next contends that over his objection on the ground the testimony would invade the province of the jury, Government's witness, a special agent with the Federal Bureau of Investigation and photographic identification specialist, compared two photographs: a photograph taken by the bank's surveillance camera at the time of the robbery and a police photograph of appellant taken ten days prior to trial. To assist in his identification, he enlarged the head area of the surveillance photograph to the same size as the enlarged head area in the police photograph. The witness then pointed out the similarity in the two photographs in the nose and mouth areas, chin line, hair lines, ear contours and inner folds of the ears, among other things. He then testified that based on all the general characteristics the individual in the

---

* The Honorable William B. Enright, United States District Judge for the Southern District of California, sitting by designation.

surveillance photograph is the individual in the police photograph "or another individual having all of these characteristics as to nose, mouth, chin, and the ear characteristics . . . ." We see no error in the admission of this testimony. While the jury is the sole judge of the facts, expert testimony has long been admissible as an aid to the jury.

434 F.2d at 644.

That concluding statement is undisputed. But whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L. Rev. 414, 418 (1952).

Advisory Committee's Note to Proposed Federal Rule of Evidence 702, 56 F.R.D. 183, 282 (1972). To permit an expert to testify as to his opinion of parentage based on the resemblance of a child to a reputed father in a paternity suit would be grossly inappropriate by the above standard. But just as surely, fingerprint identification, the comprehensive examination of aerial photographs, and other similar scientific and technical evaluations, are obviously within the realm of permissible expert testimony. Testimony as to whether a particular individual is portrayed in a photograph rests on some middle ground. Since the *Cairns* decision relied solely upon traditional expertise fields, we feel it incumbent upon ourselves to reexamine the issue faced in *Cairns*.

We have requested and reviewed the briefs submitted in *Cairns*. Such review allows us to conclude that the two cases—*Cairns* and the instant one—are distinguishable.

In the instant case, Webb's testimony was general. In reference to the photographs of Brown, he stated broad conclusions: "rather thin-faced," "somewhat elongated,"  "[t]he mustache is similar, the shape of the nose, the eyes, the eyebrows, . . . ." R.T. 260, lines 22–24. In *Cairns*, however, the testimony was of greater detail. Not only did the agent compare general contours and shapes but also found ear and lobe formations particularly significant and termed a particular facial crease as "distinctive" and "unusual." Government's Brief, United States v. Cairns, p. 5. In its argument to this court in *Cairns*, the government also emphasized the detail of the agent's testimony, for example, his comparison of a nipple in the center of the defendant's ear. *Id.* at 6.

We would hold that *Cairns* should be limited to the precision as argued in its briefs; therefore, when a party seeks to introduce expert testimony on personal photographic identification—whether to prove *or* disprove similarity, he should first be required to make an offer of proof to the court outside the presence of the jury.

After the elicitation of what facts the expert has depended upon in reaching his conclusions, the court should determine whether it has been convinced by a preponderance that the facts offered are beyond the jury's common experience. Of course, the court in reaching its determination must take into consideration that the party desiring admission may be free to argue his position without the benefit of expert testimony. If the court in its discretion, which may not be disturbed absent clear abuse, is convinced that the expert may materially assist the jury beyond their common experience as amplified by argument of counsel, the expert should be allowed to testify.

The same general test should be applied to the photographic identification and comparison of inanimate objects. The trial courts, however, should be cognizant that while the everyday ex-

periences of twelve laymen over their combined lifetimes may permit them to make photographic comparisons of persons, they may utterly lack experience to distinguish or recognize certain objects such as firearms. In the facts of this particular case, we would hold the admission of the expert's opinion on the personal identification of Brown and Swain to have been error,[1] but his testimony concerning the items seized to have been properly admitted. We cannot conclude, however, that the error, was prejudicial. Disregarding the agent's opinion as to their identity, the evidence against Brown and Swain—the eyewitness testimony, the discovery of the items—was overwhelming, rendering the error harmless.

## II  *Nobles Appeal*

The evidence against Nobles differs from the case against Brown and Swain. Most obvious is the absence of surveillance photographs, for Nobles is alleged to have been the robber who stood underneath the camera rather than within its scope. Second, no objects were found to connect him to the offense in contrast to the items seized at the apartment of Brown and Swain. Finally, the eyewitness testimony was far less impressive against Nobles than against Brown and Swain.

A bookkeeper at the bank identified Brown and Swain in court as well as the items of clothing. He could not identify Nobles. Similarly, the assistant branch manager identified Brown and Swain in court but could not identify Nobles.

A bank teller, Peter Van Gemeren, identified Brown in court. He did identify Nobles but his testimony was subjected to extensive cross-examination. Likewise, Gary Hoffman, a salesman visiting the bank, pointed out the men alleged to be Brown and Swain on the surveillance photographs and described their activities; he too identified Nobles as having stood by the business counter. Defense also subjected Hoffman to arduous cross-examination.

Although Nobles presented an affirmative alibi defense, his strongest attack was to discredit the key evidence against him: the eyewitness identification by Van Gemeren and Hoffman. To do so, his counsel not only employed cross-examination but also attempted to introduce expert opinion testimony on the frailties of eyewitness examination in general and to impeach the specific eyewitnesses by statements made by them to his investigator.

### A.  *Expertise on Eyewitness Identification*

██   Nobles offered the testimony of Dr. Robert Buckhout as an expert witness to describe the problems of eyewitness identification in general and the specific difficulties with the identifications in this case. The court refused the proffered testimony, concluding that the testimony would invade the province of the jury, that the undue consumption of time would substantially outweigh its probative value, and that the offer of proof was inadequate. We in turn cannot conclude that the trial court was in

1. The photographs introduced in this case afford a spectrum for aiding a trial court in determining when expert testimony may be permitted. There can be no reasonable doubt that the pictures of the robber who moved from cage to cage was indeed defendant Brown. The resolution of the camera is clear; his likeness unmistakable. Testimony of an expert would be of no useful purpose and hence error, but presumably, harmless.

The pictures of the man who stood to the rear of the bank are of poor resolution and quality. The only articulable characteristics concerning which the expert could testify were generalities, e. g., facial contours,

shape of sideburns. This foundation would be inadequate, and expert testimony would be error, perhaps prejudicial, depending upon the state of other evidence.

The third pictured individual was the fugitive, allegedly Jonathan Nobles, brother of defendant Nobles. The resolution of the surveillance pictures is clear, but the conclusion that the individual is Jonathan Nobles after comparison with a known photograph of Jonathan Nobles is not entirely free of doubt. An expert, in our opinion, could be useful. Of course, the discretion would lie with the trial court.

error. United States v. Amaral, 488 F. 2d 1148 (9th Cir. 1973).

### B. *Impeachment*

██ During the defense case, counsel sought to introduce the testimony of John Bond, chief investigator for the Federal Public Defenders. Mr. Bond had interviewed the witnesses Van Gemeren and Hoffman. On cross-examination Van Gemeren had testified that he did not recall telling Bond that he had seen only the back of the bank robber beneath the camera; Hoffman, during cross-examination, had denied telling Bond that all blacks look alike. Defense counsel's offer of proof was that Mr. Bond would testify that Hoffman had told him that "all blacks look alike" and that Van Gemeren had told him that "as far as the man at the surveillance camera is concerned, he [Van Gemeren] only saw the back of that man." Eventually, the court ordered that impeachment of the witnesses by Bond through these statements would be conditioned upon the defense agreeing to render to the government upon completion of the investigator's testimony the alleged statements as contained in the investigator's report. Rather than submit to this condition, defense counsel chose to forego impeachment, preferring to stand upon his client's right against self-incrimination as well as the protection of a work product rule.

██ ██ For the reasons stated below, we would hold that, despite the very limited and seemingly judicious restriction on the defense, conditioning impeachment with prosecutorial discovery was prejudicial error. Admittedly, the order was narrowly drawn. But to single out any one witness and require as a condition precedent that his previous statement be produced is inappropriate. The defendant must have the essential right to call an impeaching witness; he need not corroborate the credibility of that witness before calling him to the stand, i. e., by producing a prior recorded or transcribed statement. Were it otherwise, we would fear that such re-

quested discovery would become a matter of routine, a result we desire to avoid.

Although defense counsel did not argue that the condition impinged on the attorney-client privilege, we deem it appropriate to comment on the relevance of that privilege.

The proposed Rules of Evidence as tentatively promulgated by the Supreme Court [hereinafter Court version] included Rule 503, Lawyer-Client Privilege. 56 F.R.D. 183, 235–240 (1972). That rule in pertinent part states:

(a)(4) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

(b) General rule of privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, . . ., (2) between his lawyer and the lawyer's representative, . . . .

*Id.* at 236. In contrast, the tentative draft of H.R. 5463, 93rd Cong., 1st sess., as amended by the Subcommittee on Criminal Justice, House Committee on the Judiciary [hereinafter House version], contains no specific privilege rules. The House version would promulgate only a general rule, Rule 501, which provides that privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience . . . ." U.S.L.W., Supplement, p. 6, July 17, 1973. The rule does, however, further provide that the Supreme Court may prescribe rules pursuant to statutory authority. Thus, the Supreme Court may some day prescribe rules such as Rule 503 of its version, the literal meaning of which may arguably serve to protect a communica-

tion as existed between the investigator and counsel for the defense.

But absent any prescribed rules, common law dictates the federal rules of evidence, and the common law does not protect communications from third persons:

> Since the privilege is designed to secure subjective freedom of mind for the client in seeking legal advice . . ., it has no concern with other persons' freedom of mind nor with the attorney's own desire for secrecy in conduct of a client's case. It is therefore not sufficient for the attorney, in invoking the privilege, to state that the information came somehow to him while acting for the client nor that it came from some particular *third person* for the benefit of the client.

8 Wigmore, Evidence (McNaughton rev. 1961), § 2317(2) (emphasis original).

Defense counsel did strongly assert that to condition impeachment in the manner ordered could infringe upon his client's right against self-incrimination. This problem is indeed troubling.

When Federal Rule of Criminal Procedure 16 was amended in 1966, Justices Black and Douglas dissented. Justice Black wrote: "I am reasonably certain, however, that the Court's transmittal does not carry with it a decision that the amended rules are all constitutional. . . . And I agree with my Brother *Douglas* that some of the proposed criminal rules go to the very border line if they do not actually transgress the constitutional right of a defendant not to be compelled to be a witness against himself." 39 F.R.D. 252, 272 (1966). And Justice Douglas stated:

> The extent to which a court may compel the defendant to disclose information or evidence pertaining to his case without infringing the privilege against self-incrimination is a source of current controversy among judges, prosecutors, defense lawyers, and other legal commentators. A distinguished state court has concluded—although not without a strong dissent —that the privilege is not violated by discovery of the names of expert medical witnesses whose appearance at trial is contemplated by the defense. I mean to imply no views on the point, except to note that a serious constitutional question lurks here.

> The prosecution's opportunity to discover evidence in the possession of the defense is somewhat limited in the proposal with which we deal in that it is tied to the exercise by the defense of the right to discover from the prosecution. But *if* discovery, by itself, of information in the possession of the defendant would violate the privilege against self-incrimination, is it any less a violation if conditioned on the defendant's exercise of the opportunity to discover evidence? May benefits be conditioned on the abandonment of constitutional rights? See, *e. g., Sherbert v. Verner*, 374 U.S. 398, 403–406, 83 S.Ct. 1790, 1793–1795, 10 L.Ed.2d 965. To deny a defendant the opportunity to discovery—an opportunity not withheld from defendants who agree to prosecutorial discovery or from whom discovery is not sought —merely because the defendant chooses to exercise the constitutional right to refrain from self-incrimination arguably imposes a penalty upon the exercise of that fundamental privilege.

39 F.R.D. at 277 (footnote omitted).

The "distinguished state court" decision, referenced in the omitted footnote, is *Jones v. Superior Court*, 58 Cal.2d 56, 22 Cal.Rptr. 879, 372 P.2d 919 (1962). In *Jones*, the defendant charged with rape requested a continuance of trial, alleging that he had been impotent for a long time, and the continuance was necessary to gather essential medical evidence. The prosecution responded with a motion for discovery of witnesses, reports, and data concerning the alleged impotence. In holding that the prosecutorial discovery was proper, the California Supreme Court concluded that "since the criminal discovery permitted to the defendant is the result not of a consti-

tutional mandate of due process but rather of the desire to promote orderly ascertainment of truth [discovery] should not be a 'one-way' street." G. Lapides, Cross-Currents in Prosecutorial Discovery: A Defense Counsel's Viewpoint, 7 U.S.F.L.Rev. 217, 219 (1973), citing Jones v. Superior Court, 58 Cal.2d at 59–60, 22 Cal.Rptr. 879, 372 P.2d 919.

More recently, however, the California Supreme Court has virtually limited *Jones* to its facts. In Prudhomme v. Superior Court, 2 Cal.3d 320, 85 Cal.Rptr. 129, 466 P.2d 673 (1970), the court wrote:

> Our decision in *Jones* was based primarily upon our conviction that since discovery is a valuable tool for ascertaining the truth, it should be conducted along a "two-way street" in criminal as well as civil proceedings, to the extent permitted by constitutional principles. We readily acknowledge that *pretrial* disclosure would greatly facilitate the administration of criminal justice by minimizing the element of surprise, avoiding unnecessary delays and continuances, reducing inconvenience to the court, counsel, jurors and witnesses, and permitting more effective *pretrial* preparation. However, certain significant developments in the law since *Jones* was decided in 1962 caution us not to extend its holding beyond its facts without careful consideration of the possible effects which such an extension could have upon the accused's rights and privileges, and especially his fundamental right not to be compelled to be a witness against himself.

> . . . . . . .

> We had occasion, in People v. Schader, 71 Cal.2d 761, 770, 80 Cal. Rptr. 1, 457 P.2d 841, to analyze the policy which underlies the privilege against self-incrimination and recognized, ". . . with the United States Supreme Court, 'that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay.

. . . Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against the accused out of his own mouth.' (Malloy v. Hogan (1964) 378 U.S. 1, 7–8 [, 84 S.Ct. 1489, 12 L.Ed.2d 653].) The People must 'shoulder the entire load' of their burden of proof in their *case in chief*, without assistance either from the defendant's silence or from his compelled testimony. [Citations]." (See also Murphy v. Waterfront Comm. of N. Y. Harbor, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L. Ed.2d 678 [681–682].)

. . . . . .

Thus, if we analyze *Jones* in the light of the policy considerations discussed in *Schader*, it is apparent that the principal element in determining whether a particular demand for discovery should be allowed is not simply whether the information sought pertains to an "affirmative defense," or whether defendant intends to introduce or rely upon the evidence at trial, but whether disclosure thereof conceivably might lighten the prosecution's burden of proving its *case in chief*. Although the prosecution should not be completely barred from *pretrial* discovery, defendant must be given the same right as an ordinary witness to show that disclosure of particular information could incriminate him.

An ordinary witness need not actually prove the existence of an incriminatory hazard, as that would surrender the very protection which the privilege against self-incrimination was designed to guarantee. Instead, the privilege forbids compelled disclosures which could serve as a "link in a chain" of evidence tending to establish guilt of a criminal offense; in ruling upon a claim of privilege, the trial court must find that it clearly appears from a consideration of all the circumstances in the case that an answer to the challenged question cannot possi-

bly have a tendency to incriminate the witness.

*Id.* at 323, 325, 326, 85 Cal.Rptr. at 131, 466 P.2d at 675 (footnotes and citations omitted; emphasis supplied).

The California Supreme Court is not alone in this respect. In United States v. Fratello, 44 F.R.D. 444, 449, 451 (S. D.N.Y.1968), Judge Pollack concluded:

> If, therefore, the items sought from the defendants are of a class of evidence which would ordinarily be privileged from disclosure under the Fifth Amendment, the defendants ought not be required to disclose them prior to the establishment on trial of the government's *prima facie* case.
>
> .   .   .   .   .   .
>
> Until appellate guidance appears which indicates that, in the absence of special circumstances, the price sought by the prosecution for *pre-trial* disclosure of its records is not to be treated as an encroachment on the privilege, this Court is not prepared to condition discovery by the defendant under Rule 16(b) on *pre-trial* disclosure of privileged records in the possession or control of the defendant. In this connection it is noted that Courts usually accept the defendant's view of what records may be self-incriminatory.

Citations omitted; emphasis supplied.

Yet, *Prudhomme* and *Fratello* dealt with pretrial prosecutorial discovery as well as the constitutional concerns of conditioning defense discovery upon the possibility of enhancing the government's case in chief. In the instant case, of course, the discovery would have been during trial and useful only in rebuttal. Then, too, both *Prudhomme* and *Fratello* preceded Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), which upheld the constitutionality of a state's notice of alibi statute in the face of fifth amendment assault. We would, nevertheless, conclude that the fifth amendment remains relevant in the instant circumstances.

In United States v. Wright, 489 F.2d 1181 (D.C.Cir. 1973), the Circuit for the District of Columbia faced an analogous situation. The appellant's court-appointed counsel had employed an investigator from the Public Defender Service. The investigator interviewed potential witnesses and sent to counsel a report consisting of summaries of the interviews. At trial the court ordered the investigator who had testified in behalf of the defense to turn over a copy of the report to the government. True, the order was to forward the entire report rather than to specific, relevant portions as were ordered here, but potential incrimination exists in both circumstances.

The court concluded that the principle that criminal discovery must inevitably remain basically a one-way street is firmly imbedded in our common law tradition. *Id.* at 1192. As that circuit also noted,

> There has been some attempt in recent years to increase the Government's right to discovery in criminal cases—for example, through statutes requiring the defense to give pretrial notice of the names of witnesses to be called as part of an alibi defense. But as the Supreme Court has emphasized in holding such statutes constitutional under the Fifth Amendment, they only require the defense to turn over to the Government information which the *defense intends to reveal at trial. See* Williams v. Florida, 399 U.S. 78, 85, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

*Id.* at 1194. (Emphasis added). In the instant case, the defense prior to the cross-examination of the government's witnesses surely could not have intended to reveal its own information when the witnesses may have admitted its import during cross-examination. And if the witnesses had admitted that they had made such statements as "all blacks look alike" or "I only saw him from the back" to the investigator, the government would have had the responsibility of resurrecting its witnesses' testimony by

eliciting any rehabilitating statements by those same witnesses.[2]

Since the witnesses, for whatever reasons, denied making the initial damaging statement, the defense had no alternative but to present its impeachment evidence, i. e., Bond's testimony.[3] If the prosecutor doubted the validity of the contexts in which the purported statements were made as testified to by Bond, he surely had access to his own witnesses and by their testimony could have offered rebuttal to Bond's version. In summary, then, we agree with the Circuit for the District of Columbia that

> The defendant has a right under the Fifth Amendment to compel the state to investigate its own case, find its own evidence, and prove its own facts. The defense has no duty to help the prosecution convict the defendant. We therefore reject any rule

which would require the defense to turn over to the prosecution prior statements of defense witnesses which could be used by the prosecution as evidence against the accused.

*Id.* at 1195. See also People v. Bais, 31 Cal.App.3d 663, 107 Cal.Rptr. 519 (1st Dist. 1973).

The *Wright* panel also examined that discovery order from the perspective of the Federal Rule of Criminal Procedure 16 and the Jencks Act, 18 U.S.C. § 3500,[4] as we must.

Before the promulgation of the original rules of criminal procedure, it was doubtful whether criminal discovery was permitted. In 1966, however, Rule 16 was liberalized toward greater discovery.

The pertinent portions of Rule 16 are as follows:

> (b) *Other Books, Papers, Documents, Tangible Objects or Places.*

---

2. Enterprising counsel may arguably assert that the evidence doctrine of completeness, e. g., Cal.Evid.Code § 356 and Proposed Federal Rules of Evidence, Court version 107, House version 106, would require disclosure. But as the comment to § 356 by the Assembly Committee on the Judiciary implies, the doctrine is not a discovery device, but rather, only permits certain relevant evidence to be admitted that would otherwise be inadmissible. The burden is on the adversary to "inquire," that is, cross-examine or rebut.

    Since the Proposed Federal Rule may shift that burden, i. e., the adversary may "require" admission of the entirety, it would conceivably be utilized as a discovery tool. But the proposed rule only encompasses writings or recorded statements introduced into evidence, not the testimony of an individual, albeit that his recollection may be memorialized.

3. That impeachment is the only alternative was not lost to the prosecutor. At the close of trial, he argued:

    Mr. MacIntyre: . . . Mr. Bond never testified in the trial as to anything Mr. Hoffman did or did not say to him.

    Mr. Hoffman, you heard his testimony, and I submit to you he denied the questions, said, "No," to the questions that were asked by Mr. Allis. If he testified any differently Mr. Bond would have testified in this courtroom to you as to what the inconsistencies were, and Mr. Bond did not so testify. You heard his testimony.

    R.T. at 745, lines 6–14.

4. The panel in *Wright* gave due consideration to the problem which could arise if a witness refreshed his recollection. (There is nothing in the record to suggest Bond used his reports to refresh his recollection.) That court considered it "hornbook rule of evidence that, had [the investigator] used parts of his report to refresh his recollection while *on* the witness stand, the prosecution would be entitled to examine those parts of the report and would be permitted to make use of those parts of the report in cross-examining [him]." 489 F.2d at 1188 (emphasis added). As noted by that panel, however, refreshing recollection *prior* to testifying may stand in different posture. *See* McGill v. United States, 270 F.2d 329, 331, 106 U.S.App.D.C. 136 (1959) ; *see also*, Sullivan v. Superior Court, 29 Cal.App.3d 64, 105 Cal.Rptr. 241 (1st Dist. 1972) [attorney-client privilege applicable when client previously refreshes recollection].

    The Court version of Proposed Rule 612 generally permits an adversary to inspect, cross-examine from, and introduce portions of a writing used by a witness to refresh his recollection either *before or while* testifying. The House version has amended this by requiring the court in its discretion to determine that it be necessary in the interest of justice before a writing be divulged that has been used for prior refreshing of recollection.

Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, upon a showing of materiality to the preparation of his defense and that the request is reasonable. Except as provided in subdivision (a)(2) [examinations, tests, experiments], *this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by government agents in connection with the investigation or prosecution of the case, or of statements made by government witnesses or prospective government witnesses (other than the defendant) to agents of the government EXCEPT as provided in 18 U.S.C. § 3500.*

(c) *Discovery by the Government.* If the court grants relief sought by the defendant under subdivision (a)(2) or subdivision (b) of this rule, it may, upon motion of the government, condition its order by requiring that the defendant permit the government to inspect and copy or photograph scientific or medical reports, books, papers, documents, tangible objects, or copies or portions thereof, which the defendant intends to produce at the trial and which are within his possession, custody or control, upon a showing of materiality to the preparation of the government's case and that the request is reasonable. Except as to scientific or medical reports, *this subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents in connection with the investigation or defense of the case, or of statements made by the defendant, or by government or defense witnesses, or by prospective government or defense witnesses, to the defendant, his agents or attorneys.*

Emphasis and capitalization added.

■ Each subsection contains a work product [5] savings clause, *i. e.*, the italicized portions. But the government's work product is subject to an important exception, the Jencks Act, 18 U.S.C. § 3500, which provides in relevant part:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the

---

5. To apply the work product rule to criminal law is not unusual:

Although the . . . policies supporting protection of an attorney's work product [have been] stated with reference to civil litigation, they are even more strongly applicable in criminal proceedings. There is "an especially strong tendency toward the protection of materials as the 'work product' of an attorney in criminal cases. Thus, in relevant criminal cases (admittedly few), the courts have *consistently* held statements by witnesses . . . to be the 'work product' of an attorney." Annot., 35 A.L.R.3d 424 (1971) (footnotes omitted) (emphasis added). In State v. Montague, 101 N.J.Super. 483, 244 A.2d 699 (1968) the state sought access to the defendant's attorney's notes concerning interviews with prospective witnesses. The court states:
"[W]e are satisfied that the notes here in question represented the work product of defendant's attorney and, under the doctrine of Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), production should not have been compelled. The fears therein expressed with regard to the inviolability of an attorney's thoughts and the possibility of inefficiency, unfairness and sharp practice are equally applicable to the setting of a criminal case." 244 A.2d at 702.
In re Grand Jury Proceedings, Duffy v. United States, 473 F.2d 840, 846 (8th Cir. 1973).

witness, the court shall order it to be delivered directly to the defendant for his examination and use.

.    .    .    .    .    .

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

Thus, while Rule 16 is framed in terms of *pretrial* discovery, its inclusion of the Jencks Act leads us to conclude that Rule 16 has relevance to discovery *during* trial. And specifically, defense may discover, for purposes of impeachment, statements of government witnesses who have testified. *But* no such exception is included within the terms of subsection (c). We would conclude that the work *product of defense is inviolable in these circumstances.*[6] *See also*, United States v. Wright, 489 F.2d 1181, 1189–1190 (D.C.Cir. 1973).

Finally, the court may make brief comment upon the alleged misconduct of the prosecutor. A review of the entire transcript permits us to conclude that the prosecutor's conduct does not require reversal. In fact, the record indicates that the trial judge conducted the case most properly, and the defendants received a fair trial.

Affirmed in part, reversed in part, remanded.

KILKENNY, Circuit Judge (concurring and dissenting):

### BROWN AND SWAIN APPEALS

I concur in the affirmances of the Brown and Swain convictions, but not for the reasons stated by the majority. It is my considered judgment that the records on these appeals are free from error.

### NOBLES' APPEAL

Turning now to the Nobles' appeal, I find myself in complete disagreement

---

**6.** We may note that new proposed amendments to the Federal Rules of Criminal Procedure are pending and have been stayed by Congress until August 1, 1975. It must be noted that the proposed changes include the addition of Rule 12.1, Notice of Alibi, and 12.2, Notice of Defense Based Upon Mental Condition. Also, Rule 16 has undergone revision; of particular note is the revised Rule 16(b), Disclosure of Evidence by the Defendant:

(1) Information subject to disclosure.

(A) *Documents and tangible objects.* Upon request of the government, the defendant shall permit the government to inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial.

(B) *Reports of examinations and tests.* Upon request of the government, the defendant shall permit the government to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to his testimony.

(C) *Defense witnesses.* Upon request of the government, the defendant shall furnish the government a list of the names and addresses of the witnesses he intends to call in the presentation of the case in chief. When a request for discovery of the names and addresses of witnesses has been made by the government, the defendant shall be allowed to perpetuate the testimony of such witnesses in accordance with the provisions of Rule 15.

It must be emphasized, however, that Rule 16(b)(2), Information not subject to disclosure, retains the inviolability of internal defense documents.

with the conclusions of the majority on the issue of impeachment by the defense witness, Bond.[1] To understand the issue, it is necessary to outline in detail the events leading up to the action of the trial judge.

On direct examination, the government witness Hoffman identified Nobles as the robber standing under the surveillance camera and also identified him from a photo spread and at a police line-up prior to trial. On cross-examination, Nobles' attorney asked Hoffman, "And isn't it a fact that you told Mr. Bond that to you all the blacks appear to be alike?" Hoffman responded, "I don't believe I indicated that to him." Continuing, the attorney inquired, "You do not recall stating that to Mr. Bond?" Hoffman replied, "No, I do not." Nobles' attorney repeated, "That all blacks look alike." Hoffman responded, "No, I do not, sir." At that time, in the bench conversation outside the presence of the jury, the prosecutor requested defense counsel to furnish a copy of "any interview, notes or recorded statements of Mr. Bond—in regard to a phone call.",[2] and noted "I notice he has a copy, and I would like to have a copy of that at this time before I am able to proceed with redirect examination of the witness." Defense counsel objected. The judge indicated sympathy with the government's view and asked defense counsel to furnish authority indicating that the government was not entitled to the memorandum. After defense counsel, for the second time, rejected the demand of the prosecutor to see the document, the judge conducted a hearing and held that the prosecutor was not entitled to see the investigator's memorandum until Bond took the witness stand and impeached Hoffman's testimony in connection with the memorandum, and then only to the extent that any and all statements of any defendant be excised prior to the delivery to the prosecutor.[3]

Later, defense counsel called Bond. The court inquired as to the nature of Bond's testimony. Counsel responded that the witness would testify as to certain photographs and that ". . . he is going to impeach two statements of Mr. Hoffman." The court then inquired of defense counsel whether he would turn over, at the completion of Bond's testimony, the relevant portions of the document to the prosecution. Defense counsel refused. The court thereupon indicated that those portions of the testimony dealing with the impeachment would be excluded.[4] After an extended colloquy in which the judge fully ex-

---

1. Chief Investigator, Federal Public Defenders Association.

2. It is conceded that the conversation was by way of phone.

3. "THE COURT: . . . The Court is going to rule as follows: first of all, the government may not have the memorandum until the witness has taken the stand and has indicated the particular impeaching testimony which was the last part of Mr. Hoffman's testimony relative to his inability to distinguish between people of the black race. And if he does make such a statement, if he and Mr. Bond make such a statement, then I believe the government is entitled to an examination of the memorandum—not before that time—but after that time, after he has completed his entire testimony . . . .

    \*     \*     \*     \*     \*

"THE COURT: I will say this to assist you, Mr. Allis, while I think about it. I am sure there are no statements of any of the defendants contained in this particular memorandum, and my order is going only to this particular memorandum. I am not generalizing on any other memorandum or memoranda which you may have. It goes only to this particular memorandum involving the particular witness Hoffman. If you represent to me that there are matters contained therein, such as recitals by the defendants or your defendant, of course, I would view it imperative that you have the opportunity to excise that, perhaps after an in-camera session with the Court, or something of that nature." [R.T. 470–471].

4. "THE COURT: Mr. Allis is an officer of the court, and [if] Mr. Bond is allowed to testify it would be necessary that those portions of Mr. Bond's investigative report which contain the statements of the impeached witness will have to be turned over to the prosecution; nothing else in that report.

plained that he would only require the defense to permit inspection of those portions of the memorandum which dealt with the impeaching questions propounded to Hoffman, the court offered to expedite the trial by examining the report *in camera* and there excise such portions not relevant to the Hoffman impeachment. Defense counsel again rejected the court's offer with a statement of his position.[5] Defense counsel then proceeded with the examination of Bond as a defense witness, but did not ask him whether or not Hoffman had made the statement during the telephone conversation of April 6, 1973, ". . . that all blacks appear to be alike."

Obviously, the appellant is in no better position than if Bond had been called, testified that Hoffman had made the statements and on cross-examination was asked if he had made any notes at the time of the telephone conversation, responded that he had and then the prosecutor had asked for the production of the notes. If defense counsel, after a direct order from the judge, failed to produce the notes for inspection, the judge, no doubt, would have ordered the testimony stricken and the jury would have been instructed to disregard it. Here, as often happens in a well-tried case, the judge and the attorneys anticipated the problem and defense counsel was saved the embarrassment of having the testimony stricken in the presence of the jury. It may have been a good trial tactic, but I do not believe appellant is entitled to cash in on it.

The record is clear that defense counsel had the Bond statement on his desk and was utilizing it in connection with the cross-examination of Hoffman. If the trial had followed the customary course and Bond had taken the witness stand, without the preliminary discussions and the court's advisory ruling on the production of the statement, Bond, no doubt, would have said that he used the statement to refresh his memory. For that matter, the record of the proceedings necessarily points to this conclusion. Additionally, there was nothing amateurish about defense counsel's performance and it would be doing him a great injustice to assume that he did not properly prepare the witness by having him read the memorandum. In these circumstances, the price a defendant must pay for having a witness take the witness stand, and testify contrary to declarations of another witness, is to throw open the entire subject to normal cross-examination and to make his testimony vulnerable where, otherwise, it might have been shielded. Surely, the appellant cannot claim for this witness a right which was not available to himself if he had taken the witness stand under the same circumstances.

Closely in point is Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L. Ed.2d 1 (1971), where the court approved the introduction of a statement on cross-examination which could not have constitutionally been utilized on the direct examination of the defendant. There the court held that the defendant, having voluntarily taken the stand, was under an obligation to speak truthfully and accurately, and that in confronting him with his previous statement, the prosecution was doing no more than utilizing the traditional truth-testing devices of the adversary process. Here, if produced, the memorandum might show that Bond did not include the alleged material forming the basis for the im-

---

"If Mr. Allis indicates to me that he refuses to do that, then I am not going to allow the particular witness to testify in that area. Now, it is entirely up to Mr. Allis as to what portion, if any, of Mr. Bond's testimony he wishes to elicit." [R.T. 520].

5. "MR. ALLIS: My position at this time, your Honor, Rule 16 is that the other discovery consents in the Federal Court, that the Fourth, Fifth and Ninth Amendments protect the defendant in whose possession the reports are from turning them over for any reason.

"THE COURT: We are not talking about pretrial discovery. This is post testimony discovery. It has been carefully considered by the Court, and I am narrowing my ruling to the very specific area." [R.T. 526].

peaching questions to Hoffman. If that were true, the integrity of Bond's testimony would be severely diminished. The prosecutor, in requesting the production of the statement for cross-examination, was doing ". . . no more than utiliz[ing] the traditional truth-testing devices of the adversary process." 401 U.S. at 225, 91 S.Ct. at 645. One of the most common practices employed in the art of cross-examination is to ask for theproduction of any notes or statements which a witness may have used to refresh his recollection.

The purpose of a trial is to develop the truth, not suppress it. We can assume that appellant's counsel was not playing games and that the memorandum probably made no reference to the impeachment questions propounded to the witness Hoffman. Otherwise, there would be no logical reason for the refusal to produce it.

My conclusions with reference to the questions propounded to Hoffman are equally applicable to the questions propounded to the witness Van Gemeren.

We are not here confronted with pretrial discovery proceedings, such as those before the court in the California cases cited by the majority, and United States v. Fratello, 44 F.R.D. 444, 449, 451 (S.D.N.Y.1968), speaking to the same type of procedure. Much more akin to our problem, as recognized by the majority, is Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), where a state notice of alibi statute was upheld in the face of a Fifth Amendment constitutional challenge.

United States v. Wright, 489 F.2d 1181 (C.A. D.C.1973), is closer to the target, but is distinguishable on at least three important grounds: (1) in *Wright* the order was overly broad and required defense counsel to surrender for inspection the entire report, rather than the specific portions relevant only to the impeaching question; (2) there, the prosecutor was seeking the statement to use it as substantive evidence, rather than for impeachment purposes; and (3)

*Wright* recognizes, as a Hornbook rule of evidence, that had the investigator used parts of his report to refresh his recollection, the prosecution would be entitled to examine those parts of the report relating to impeachment, and would be permitted to make use of them in the cross-examination. The opinion then goes on to emphasize that the investigator *did not* use the report to refresh his recollection. In *Wright,* there was evidently nothing in the record to warrant the court in assuming that the statement in the investigative report was used by the witness to refresh his recollection. Here, as previously mentioned, I feel that the presence of the statement on counsel table, his use of the statement in interrogating Hoffman and his lengthy colloquy with the court and opposing counsel would clearly indicate that Bond had so refreshed his recollection.

Rule 612, Proposed Federal Rules of Evidence, as submitted to the Congress by the Supreme Court, permits an adversary to inspect, cross-examine on and offer in evidence portions of a writing used by a witness to refresh his recollection either before or while testifying. The House has proposed an amendment which would require the court, in its discretion, to pass on whether the interests of justice would be served by divulging the contents of the writing. The proposed legislation is in line with the *in camera* inspection here suggested by the trial judge. In any event, it is crystal clear that the decision in *Wright* turns on the overbroadness of the order requiring the production of the report. We quote from page 1189:

> "In addition, the rules governing documents used to refresh recollection could in no event justify requiring Reeves to turn over his entire investigative report to the prosecution. As a defense witness Reeves testified only as to two matters—his interview with Richardson on January 19 and his examination of the lighting conditions at the scene of the crime. Assuming they had been used to refresh his rec-

ollection at trial, those parts of his investigative report relative to this testimony and of possible use to the Government in cross-examining Reeves with respect to this testimony would have to be turned over to the prosecution.

\*　　\*　　\*　　\*　　\*　　\*

"Even if Reeves used the report to refresh his recollection, only those parts of the report relating to his testimony on direct need have been turned over to the Government."

Here, the majority concedes that the order was stated with precision and limited to the challenged areas of impeachment.

As repeatedly stated by the trial judge, we are not here concerned with the Jencks Act, 18 U.S.C. § 3500, or with Rule 16, F.R.Crim.P. Our problem centers on a simple common law evidentiary question of whether a witness, who was called for impeachment purposes, must produce the notes he admittedly made on the subject of impeachment.

Finding no error, I would affirm the judgment of the lower court.