**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Charles LANGFORD,**
**Defendant-Appellant.**

No. 85–1217.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 14, 1986.

Decided Oct. 21, 1986.

**1178**

Robert Fourr, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Judd C. Iversen, San Francisco, Cal., for defendant-appellant.

Before SNEED, FARRIS and FERGUSON, Circuit Judges.

FARRIS, Circuit Judge:

Charles Langford appeals his conviction of unarmed bank robbery (18 U.S.C. § 2113(a)). We have jurisdiction under 28 U.S.C. §§ 1291 and 1294. We affirm.

 By indictment handed down February 6, 1985, Langford was charged with armed bank robbery (18 U.S.C. § 2113(d)). He was tried before a jury and convicted of the lesser included offense of unarmed bank robbery (18 U.S.C. § 2113(a)). On April 19, 1985, the district court granted Langford's motion for a new trial and permitted his counsel to withdraw upon the latter's representation that he had "conflicts" with Langford. The matter was set to be retried on May 13, 1985. On May 8, 1985, substitute counsel moved for a continuance to prepare for trial. The motion was heard and granted on May 13, 1985. The matter was reset for July 8, 1985. On June 7, 1985, Langford filed a discovery motion that was heard June 13, 1985. The time between the filing and disposition of these motions was excludable for Speedy Trial Act purposes. 18 U.S.C. § 3161(h)(1)(F). Thus, while the second trial commenced some 80 calendar days after the motion for new trial was granted, the 70-day time limit for retrial established under the Act, 18 U.S.C. § 3161(e), was not violated. Accordingly, we do not decide whether the trial court improperly granted original trial counsel leave to withdraw, thereby prejudicing Langford's right to a speedy trial.

 At trial Langford's cousin, Jerry Lankford, and his parole officer, Richard Wood, testified that the person depicted in

bank surveillance photographs taken during the robbery was Langford. Such opinion testimony by lay witnesses is admissible under Fed.R.Evid. 701 if it is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." *United States v. Young Buffalo*, 591 F.2d 506, 513 (9th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979); *United States v. Butcher*, 557 F.2d 666, 669–70 (9th Cir.1977). Such testimony is particularly valuable where, as in the present case, the lay witnesses are able to make the challenged identifications based on their familiarity with characteristics of the defendant not immediately observable by the jury at trial. *See, e.g., United States v. Barrett*, 703 F.2d 1076, 1086 (9th Cir.1983); *United States v. Young Buffalo*, 591 F.2d at 513. We conclude that, because Wood had met with Langford approximately 50 times and Lankford had known Langford most of his life, the opinions testified to by Lankford and Wood were rationally based and helpful to the jury in determining a fact in issue. Fed.R.Evid. 701.

■ Langford suggests that opinion testimony on ultimate issues of fact is inadmissible. Opinion testimony on ultimate issues of fact is admissible unless the testimony concerns the mental state or condition of a defendant in a criminal case. Fed.R.Evid. 704. Because the testimony Langford objects to was neither given by an expert nor concerned with Langford's mental state or condition, Langford's objection is untenable.

■ Langford additionally maintains that the trial court abused its discretion in balancing the probative value of the lay opinion testimony against its potential for prejudice. Rule 403 of the Federal Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ..." Fed.R. Evid. 403. We conclude that, given the familiarity both Lankford and Wood had

with Langford, their testimony was sufficiently probative to outweigh the danger of unfair prejudice. The district court thus did not abuse its discretion in this respect.

■ Upon Langford's ex parte application, the trial court appointed an expert in the field of eyewitness identification to assist in preparation of Langford's defense. Such an appointment requires a finding that the services of the expert "are necessary for an adequate defense." 18 U.S.C. § 3006A(e)(1). Nevertheless, at trial the court excluded the expert's testimony concerning the unreliability of eyewitness identification:

I rather think in all of these situations it is a balancing question. The ruling of the court (excluding the proffered testimony) is in no way predicated upon the absence of qualifications of the witness who has been identified in his professional field of psychology. The ruling, including the use of his testimony as an expert, is that it goes beyond the field of expertise to which such testimony should be directed or can be directed, and is basically argumentative and intrusive upon the jury's responsibility as triers of the facts of the case.

Even if the admission of expert testimony concerning eyewitness identification is proper under certain circumstances, "there is no federal authority for the proposition that such testimony *must* be admitted." *United States v. Moore*, 786 F.2d 1308, 1312–13 (5th Cir.1986). We have repeatedly upheld the exclusion of such testimony. *See United States v. Brewer*, 783 F.2d 841, 842 (9th Cir.1986); *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir.1973). It was within the broad discretion of the trial court to conclude that, on balance, the jury would not benefit from admission of the proffered evidence. *See United States v. Solomon*, 753 F.2d 1522, 1525 (9th Cir. 1985) (quoting *United States v. Awkard*, 597 F.2d 667, 669 (9th Cir.), *cert. denied*, 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 *and* 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 383 (1979) ("Expert testimony is admissible if the jury may receive 'appreciable help'

from it."). *See also Brown v. Darcy*, 783 F.2d 1389, 1396 (9th Cir.1986) (Expert testimony is properly excluded where it "infringes on the jury's role"; *United States v. Binder*, 769 F.2d 595, 602 (9th Cir.1985) ("Expert testimony should not be permitted if it concerns a subject ... that invades the province of the jury."); *Amaral*, 488 F.2d at 1153 ("It is the responsibility of counsel during cross-examination to inquire into the witness' opportunity for observation, his capacity for observation, his attention and interest and his distraction or division of attention."). As exclusion was not "manifestly erroneous," the judgment will not be disturbed. *See Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962).

At Langford's behest, the professional relationship between Langford and Parole Officer Richard Wood was not revealed to the jury when Wood identified Langford in the bank surveillance photographs. Sworn declarations submitted by Langford in connection with his post-trial motion for a new trial establish (1) that during a recess in trial proceedings Wood entered and exited the probation office in view of the jury, and (2) that post-trial interviews with an undisclosed number of jurors revealed that three had determined that Wood was Langford's probation or parole officer.

Langford contends that the affidavits establish that the jury was improperly exposed to "extraneous and prejudicial matter" and that the trial court erred in failing to grant his motion for a second new trial. His argument is that Wood's presence in the probation office gave rise to the inference that Langford had previously been convicted of a federal offense. That information, he continues, prejudiced Langford's defense, necessitating reversal and a third trial. In the alternative, Langford contends that the matter should be remanded for a hearing concerning the nature of any extraneous information that reached the jury. We disagree.

▮ When information not admitted into evidence reaches the jury, "the defendant is entitled to a new trial if 'there exist-ed a reasonable possibility that the extrinsic material could have affected the verdict.' " *United States v. Bagley*, 641 F.2d 1235, 1240 (9th Cir.) (citing *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir.1979)), *cert. denied*, 454 U.S. 942, 102 S.Ct. 480, 70 L.Ed.2d 251 (1981). While we independently review allegations of juror misconduct to determine whether a new trial is required, *United States v. Halbert*, 712 F.2d 388, 389 (9th Cir.), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984), we give substantial weight to the district court's conclusion about the effect of the juror misconduct. *Id.* The tenuous connection between Wood's emergence from the probation office and knowledge of Langford's prior conviction is insufficient to support a finding of a reasonable possibility that the event complained of could have affected the verdict. While we recognize that where a trial court learns of a possible incident of jury misconduct, it is preferable to hold an evidentiary hearing "to determine the precise nature of the extraneous information," *United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir.) *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982), not every allegation that extraneous information has reached the jury requires a full-dress hearing. *United States v. Halbert*, 712 F.2d at 389 (hearing not required where the trial court knew the exact scope and nature of the extraneous information). The district court did not abuse its discretion by failing to conduct such a hearing. *Cf. Halbert*, 712 F.2d at 389.

We have reviewed the additional assignments of error urged by Langford in his pro se briefs and find them to be uniformly meritless.

AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

It is time for this circuit to reexamine the importance of expert testimony concerning the reliability of eyewitness identification and to provide guidance to the district courts for exercising discretion to exclude such testimony. I therefore dissent from

the majority's unquestioning reliance on *United States v. Amaral*, 488 F.2d 1148 (9th Cir.1973). We should instead adopt the guidelines emerging from cases that actually consider this issue. *See United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985); *United States v. Smith*, 736 F.2d 1103 (6th Cir.), *cert. denied*, 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984). I would vote to reverse Langford's conviction because the district court abused its discretion by refusing to admit expert testimony regarding eyewitness unreliability.

## I.

On January 15, 1985, a bank robbery occurred in San Francisco. Although no physical evidence was obtained from the crime scene, the bank's surveillance camera photographed the robbery. Two days after the robbery, the bank teller who was robbed, Eufrocina Clemente, identified an individual as the robber from a photo line-up. Later investigation revealed that the identified person could not have committed the crime, and he was released from custody.

On January 23, 1985, Clemente was shown another set of photos, and this time she identified the defendant as the robber. Police showed the same set of photos to another bank teller, Sheri Bitanga, but she could not identify anyone in the photos as the robber.

The government charged the defendant, in an indictment, with armed bank robbery in violation of 18 U.S.C. § 2113. At trial, identification of the person who robbed the bank consisted entirely of the testimony of two eyewitnesses, Clemente and Bitanga, and the lay opinions of two persons that the defendant was the person in the bank surveillance photo.

The court refused to allow the defendant's expert witness to testify on the unre-

liability of eyewitness identification, stating:

The ruling of this court is in no way predicated upon the absence of qualifications of the witness who has been identified in his professional field of psychology. The ruling, including the use of his testimony as an expert, is that it goes beyond the field of expertise to which such testimony should be directed or can be directed, and is basically argumentative and intrusive upon the jury's responsibility as triers [sic] of the facts of the case.

The expert would have testified that perception, retention, recall, and cross-racial factors affect an eyewitness's ability to identify an individual.

## II.

The facts of this case directly force us to evaluate the continuing vitality of Ninth Circuit precedent in light of thirteen years of scientific development in the field of human perception, retention, and recall, and recent Supreme Court and other circuits' case law.

In 1973, when scientific work with eyewitness identification was developing, we upheld a district court's decision to exclude expert testimony regarding eyewitness reliability. We determined whether the district court abused its discretion to exclude the expert testimony by evaluating four factors: "1. qualified expert; 2. proper subject; 3. conformity to a generally accepted explanatory theory; and 4. probative value compared to prejudicial effect." *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir.1973). Despite the multitiered framework it established, *Amaral* addressed only the second factor: whether the testimony was a "proper subject" at that time. We described the test for admitting expert testimony as "whether the jury can receive 'appreciable help from such testimony.'" *Id.* at 1152.[1] We held that the

---

**1.** The Federal Rules of Evidence, enacted after *Amaral*, state the test for admissibility in slightly different terms. Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or edu-

district court did not abuse its discretion only because the expert's testimony was no more "helpful" to a jury than effective cross-examination. *Id.* at 1153. In the ensuing thirteen years, however, the scientific community has produced a significant amount of information demonstrating the value of expert testimony about eyewitness unreliability.

The majority in this case, as with every Ninth Circuit case since *Amaral,* affirms a district court's decision excluding such expert testimony with little or no discussion of the issues involved or the growing body of scientific and psychological information available. *See United States v. Poole,* 794 F.2d 462, 468–69 (9th Cir.1986); *United States v. Brewer,* 783 F.2d 841, 843 (9th Cir.1986); *United States v. Smith,* 563 F.2d 1361, 1363 (9th Cir.1977), *cert. denied,* 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978); *United States v. Brown,* 501 F.2d 146, 150–51 (9th Cir.1974), *rev'd on other grounds sub nom. United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *see also United States v. Sims,* 617 F.2d 1371, 1375 (9th Cir.1980) (reviewing refusal to appoint eyewitness expert). *But see Smith,* 563 F.2d at 1364–66 (Hufstedler, J., dissenting).

The issue defendant raises—one the majority and these other cases have for the most part ignored—is whether the scientific field has sufficiently developed since *Amaral* to conclude that such expert testimony could provide appreciable assistance to the jury beyond that obtained through cross-examination and the jurors' collective common sense. Because the *Amaral* court examined the issue when the relevant theories were in their infant stages, *see Amaral,* 488 F.2d at 1153 (noting that no other reported decision addressed issue), I believe we must open our eyes and examine the current state of knowledge, rather than blindly reaffirming *Amaral.* The evidence is overwhelming that the *Amaral* conclu-

sion—that juries could not gain from such expert testimony—is untenable today.

Expert testimony that can explain to a jury the problems inherent in eyewitness identification is extremely relevant. Given the unreliability and pervasive influence of eyewitness testimony, expert testimony is not only more probative than prejudicial, it prevents the eyewitness testimony from having an overly prejudicial effect. Courts and scholars have long recognized the untrustworthiness of eyewitness testimony. *E.g., Watkins v. Sowders,* 449 U.S. 341, 350, 101 S.Ct. 654, 659–60, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting) ("eyewitness identification evidence is notoriously unreliable"); *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."); *Jackson v. Fogg,* 589 F.2d 108, 112 (2d Cir.1978) ("Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness [are] highly suspect."); E. Borchard, *Convicting the Innocent: Errors of Criminal Justice* (3d ed. 1970). The problem is compounded because juries almost unquestioningly accept eyewitness testimony. *See, e.g., Watkins,* 449 U.S. at 352, 101 S.Ct. at 660–61 (Brennan, J., dissenting) ("[D]espite its inherent unreliability, much eyewitness identification evidence has a powerful impact on juries."); E. Loftus, *Eyewitness Testimony* 9 (1979) (eyewitness identification is "overwhelmingly influential"); P. Wall, *Eye-Witness Identification in Criminal Cases* 19 (1965) ("[J]uries are unduly receptive to identification evidence and are not sufficiently aware of its dangers.").

Expert testimony on this issue is important because it reveals the reasons why a witness may truthfully, but mistakenly, believe that the defendant was the culprit.

---

cation, may testify thereto in the form of an opinion or otherwise.

Thus, the rules permit expert testimony if it "will be helpful to the trier of fact in under-

standing evidence that is simply difficult, [although] not beyond ordinary understanding." S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 451 (3d ed. 1982).

*See United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir.1986); I. Horowitz & T. Willging, *The Psychology of Law: Integrations and Applications* 238–41 (1984). We can no longer believe that jurors come to the courtroom already equipped with such knowledge. *See United States v. Downing*, 753 F.2d 1224, 1230–31 (3d Cir.1985) (factors regarding reliability are "beyond what an average juror might know as a matter of common knowledge and indeed some of them directly contradict 'common sense' "); *United States v. Smith*, 736 F.2d 1103, 1106 (6th Cir.), *cert. denied*, 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984).

The key to the *Amaral* holding is that panel's conclusion this information may be obtained by cross-examination. However, cross-examination cannot uncover the reasons for misidentification because the witness honestly does not believe he or she has misidentified the defendant. *See Downing*, 753 F.2d at 1230 n. 6 ("To the extent that a mistaken witness may retain great confidence in an inaccurate identification, cross-examination can hardly be seen as an effective way to reveal the weaknesses in a witness' recollection of an event."). Moreover, a witness is unqualified to testify about the theories surrounding perception, retention, and recall. Only one trained in psychology or science could testify about such theories. Finally, even with such cross-examination, juries are unduly influenced by eyewitness testimony. *See* Rahaim & Brodsky, *Empirical Evidence versus Common Sense: Juror and Lawyer Knowledge of Eyewitness Accuracy*, 7 Law & Psychology Rev. 1, 7 (1982).

For these reasons, I believe that we cannot uphold exclusion of expert testimony based solely on the reasons set forth in *Amaral*. The issue then becomes: Should the evidence be excluded on other grounds?

### III.

Although most circuit court decisions have upheld district courts' exclusion of such evidence, *see Downing*, 753 F.2d at 1230 n. 4 (collecting cases), the emerging trend in both state and federal courts is to

favor admissibility. *See id.; Smith*, 736 F.2d at 1103; *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984); *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983). Each of these recent decisions has recognized that the eyewitness expert field has developed tremendously since the 1970s. *See, e.g., McDonald*, 37 Cal.3d at 365, 208 Cal.Rptr. at 245, 690 P.2d at 718 (citing the proliferation of empirical studies and scholarly work since the 1970s). The courts that favor admissibility have found that the field has produced a substantial body of highly sophisticated and generally accepted theoretical explanations for ascertaining and evaluating the reliability of eyewitness testimony.

On the other hand, decisions that continue to limit admissibility do so primarily for three reasons. First, some courts have held, as the district court did here, that the testimony is inadmissible because it usurps the jury function. *See, e.g., United States v. Brown*, 540 F.2d 1048, 1054 (10th Cir. 1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977). This rationale has been discredited and rejected by scholars, the Federal Rules of Evidence, and the Supreme Court. Dean Wigmore claimed that the jury function reasoning is a "mere bit of empty rhetoric." 7 J. Wigmore, *Evidence in Trials at Common Law* § 1920, at 18 (J. Chadbourn rev. ed. 1978). The Federal Rules of Evidence have eliminated this rationale as a permissible objection to opinion evidence. Fed.R.Evid. 704(a) ("[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."); *see also United States v. Rogers*, 769 F.2d 1418, 1425 (9th Cir.1985). The Supreme Court rejected similar arguments in *Barefoot v. Estelle*, 463 U.S. 880, 899, 103 S.Ct. 3383, 3397–98, 77 L.Ed.2d 1090 (1983) ("We are not persuaded that [psychiatric evaluations of dangerousness are] almost entirely unreliable and that the factfinder and the adversary system will not be competent to

uncover, recognize, and take due account of its shortcomings.").

Second, in some early decisions courts concluded that the expert testimony lacked sufficient scientific reliability. *See, e.g., United States v. Watson,* 587 F.2d 365, 369 (7th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979). This rationale can no longer be used to exclude this evidence. *Moore,* 786 F.2d at 1312. As the most recent court decisions have found, the scientific study of eyewitness identification has become a respected and sophisticated one. *See, e.g., Smith,* 736 F.2d at 1107.

Third, courts have held that the probative value of the expert testimony is outweighed by its prejudicial impact on the jury. *See, e.g., United States v. Fosher,* 590 F.2d 381, 383–84 (1st Cir.1979). However, the "prejudice" involved in such an inquiry refers to "prejudice" to the defendant. *See Smith,* 736 F.2d at 1107. Moreover, the expert testimony is no more prejudicial or influential than the eyewitness testimony itself, yet no court has held that eyewitness testimony should be excluded in all cases.

## IV.

We should follow the guidelines for admitting expert testimony on eyewitness identification presented in the recent decisions favoring admissibility. Each provides extensive guidance to the trial courts in resolving this question.[2] Each examined the expert's qualifications, the reliability of the evidence, the likelihood of misleading or confusing the jury, and the link between the proffered testimony and the particular facts of the case in deciding whether such testimony is admissible. *See Downing,* 753 F.2d at 1237–43; *Smith,* 736 F.2d at 1105–07.

Establishing such guidelines would prevent the continued application of a mechanical rule against admitting expert testimony on the reliability of eyewitness identifi-

cation. Defendant contends that the district court used such a mechanical rule here. I agree. Under the circumstances of this case, the trial court abused its discretion by excluding the proffered testimony. The government relied almost entirely on eyewitness testimony to link the defendant to the crime. If expert testimony is ever appropriate, it is here. One of the eyewitnesses, Clemente, initially misidentified another person as the robber. The other, Bitanga, stated that she did not get a "good look" at the robber and could not identify the defendant in the police's first photo lineup. Both viewed the robber under similarly stressful conditions. *See Moore,* 786 F.2d at 1313 ("We emphasize that in a case in which the sole testimony is casual eyewitness identification, expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged.").

In certain cases, there may be sufficient reason to exclude the evidence, but I cannot condone the practice of a blanket rule of exclusion in every case. More important, this court has never provided any guidance in exercising that discretion. Without such guidance, the review for "abuse of discretion" becomes a meaningless charade. If we are to abdicate our appellate responsibilities in this fashion, let us do so openly.

If these facts do not cry out for reversing for abuse of discretion, none will. I would reverse.

---

**2.** The government criticizes these approaches as being too complicated and points to the simplicity of the *Amaral* scheme. My reading of

*Amaral* reveals no required procedure whatsoever. It held simply that the district court did not abuse its discretion.