**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Walter D. BRODIE,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Nancy A. BRODIE,**
**Defendant–Appellant.**

**Nos. 87–1046, 87–1047.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 1988.

Decided Sept. 21, 1988.
As Amended Nov. 16, 1988.

---

Laura Lee, Billings, Mont., for defendants-appellants.

Thomas E. Flynn, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before GOODWIN, Chief Judge, and CHAMBERS and NORRIS, Circuit Judges.

GOODWIN, Chief Judge:

## I.

Walter Brodie and his wife Nancy Brodie appeal their convictions under 26 U.S.C. § 7203 (1982 & Supp. II 1984) for willful failure to file income tax returns. We affirm.

Walter Brodie is a doctor and Nancy Brodie is a registered nurse. Between 1970 and 1986, they operated a medical practice together in the Reno/Lake Tahoe area. Nancy Brodie worked full time as a nurse for the medical practice during 1979 and 1980 while simultaneously serving as its accountant and bookkeeper. In 1979, Taxpayers earned more than $75,873 from their medical practice. In 1980, they earned more than $116,554.

Neither of Taxpayers has filed a federal income tax return since 1971. In 1972, Taxpayers sent the Internal Revenue Service a Form 1040 on which they had written "unknown" in all the spaces calling for financial information.

In 1977, the Taxpayers were prosecuted for failing to file their federal income tax returns for the tax years 1972 and 1973. At trial, they maintained that they did not have to file returns because federal reserve notes were not legal tender. They were both convicted and each received a six-month jail sentence. Their convictions were later affirmed on appeal by this court in an unpublished memorandum.

In November 1977, Walter Brodie attended a series of tax seminars sponsored by the American Law Association (ALA). ALA representative Bruce Ripley explained to the participants that they could reduce their federal income tax liability through the establishment of off-shore trusts that he called foreign Business Trust Organizations (BTOs). BTOs were established by signing and notarizing a document called a "Contract and Declaration of Trust." In January 1978, Taxpayers sent Ralph Bowman to the Turks and Caicos Islands, where he established six BTOs. None of these BTOs ever had a bank account and none of Taxpayers' money was ever transferred to any of the BTOs.

On July 31, 1978, Taxpayers executed an additional document entitled "Contract and Declaration of Trust of Common Law Trust Organization." This document purported to set up a "trust," called the Shillinglaw Investment Company, with Taxpayers as its trustees. On September 29, 1978, Walter Brodie opened a bank account at the Valley Bank of Nevada in the name of the Shillinglaw Investment Company. Between January 1, 1979, and June 1980, Nancy Brodie deposited the receipts from their medical practice into the account. Nancy Brodie also paid their business and personal expenses directly from this account.

In October 1979, IRS agent Lee Battershell contacted Taxpayers and attempted to get information concerning their tax liability for the years 1976 through 1978. Taxpayers told her that they were protesting the payment of taxes and explained to her at length their belief that federal reserve notes were not legal tender.

Shortly after Battershell's visit, Taxpayers opened a new bank account under the name Shillinglaw Investment Company at the Kirk State Bank in Kirk, Colorado. Between July 1980 and December 1980, Nancy Brodie deposited the receipts from their medical practice into this account. She also began paying their business and personal expenses directly from this account.

## II.

Taxpayers assign as the principal ground of error the alleged intrusion of prejudicial matter into the jury room. During the trial, two of the jurors notified the court that they had received in the mail a booklet titled "Citizens Rule Book." The booklet contained numerous quotations from the Bible, the United States Constitution, and the Magna Carta. The court immediately cautioned those jurors who had received the booklet not to discuss it among themselves. Jurors who had not yet received one of the booklets were told not to read it and to turn their copy over to the court.

The district court carefully questioned each of the jurors and alternates about their receipt of the booklet and their reaction to it. Only three of the jurors and one of the alternates had actually received a copy of the booklet. The alternate and one of the three jurors were eventually dismissed and did not participate in the jury deliberations. None of the jurors who ac-

tually decided the case had read the booklet. In response to questioning by the court, each juror stated that the existence of the booklet would have no effect on his or her ability to be fair and impartial in the case. Nonetheless, Taxpayers moved for a mistrial.

■ Although a trial court's refusal to grant a mistrial is reviewed de novo, we "remain mindful" of that court's conclusion about the effect of extrinsic material seen by jurors. *See United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *United States v. Langford,* 802 F.2d 1176, 1180 (9th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3235, 97 L.Ed.2d 740 (1987). Taxpayers are entitled to a new trial if there is a reasonable possibility that the extrinsic material could have tainted the verdict. *Langford,* 802 F.2d at 1180; *Bagnariol,* 665 F.2d at 887 n. 6; *United States v. Bagley,* 641 F.2d 1235, 1240 (9th Cir.), *cert. denied,* 454 U.S. 942, 102 S.Ct. 480, 70 L.Ed.2d 251 (1981); *United States v. Vasquez,* 597 F.2d 192, 193 (9th Cir.1979). On appeal, we will not disturb a jury verdict when extrinsic material relates only to issues not material to the guilt or innocence of the defendant. *Bagnariol,* 665 F.2d at 885.

■ The extrinsic material, the "Citizens Rule Book," did not have the possibility of affecting the verdict. Counsel for both parties thoroughly questioned each of the jurors about any effect the booklet may have had on them. Each of the jurors stated that the booklet had no effect on their ability to be fair and impartial. More importantly, the booklet made no reference to any issue at the trial, and none of the jurors who decided the case had ever read the booklet. The nexus between the extraneous material and the verdict was not direct and rational, as required by *Bagnariol. See Marino v. Vasquez,* 812 F.2d 499, 506–07 (9th Cir.1987). Thus, the extrinsic material could not have tainted the verdict. *See United States v. Steele,* 785 F.2d 743,

746–49 (9th Cir.1986). Because there is nothing to support Taxpayers allegation of prejudicial jury tampering except speculation and imagination, the trial court properly denied Taxpayers' motion for mistrial.[1]

### III.

■ The next alleged error is assigned to the trial court's decision to exclude expert testimony. We review the exclusion of opinion evidence for manifest error or an abuse of discretion. *United States v. Binder,* 769 F.2d 595, 601 (9th Cir.1985); *United States v. Solomon,* 753 F.2d 1522, 1525 (9th Cir.1985). We will reverse a conviction based upon the erroneous exclusion of expert testimony only if the exclusion more likely than not materially affected the verdict. *See Binder,* 769 F.2d at 601–02; *United States v. Valle–Valdez,* 554 F.2d 911, 916 (9th Cir.1977).

In assessing the admissibility of expert testimony, the probative value of the evidence must be weighed against its prejudicial effect. *See* Fed.R.Evid. 403. This assessment lies in the discretion of the trial court. *Solomon,* 753 F.2d at 1525; *United States v. Awkard,* 597 F.2d 667, 669 (9th Cir.), *cert. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979). The district court therefore has broad discretion to conclude that, on balance, the jury would not have benefited from admission of expert testimony. *See United States v. Navarro–Varelas,* 541 F.2d 1331, 1334 (9th Cir.1976), *cert. denied,* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977).

■ Taxpayers attempted to call an accountant to testify that he had examined their business records for 1979 and 1980 and had determined that they owed no taxes for 1979 and less than $1,000 in taxes for 1980. This ultimate conclusion was the very question the jury had to answer from the law and the evidence. It was not subject to a so-called expert's opinion.

Taxpayers primarily rely on *United States v. Walker,* 479 F.2d 407 (9th Cir.

---

**1.** Furthermore, the trial judge instructed the jurors not to draw any inferences from either the content of the pamphlets or the fact that they received them, and the evidence presented at trial overwhelmingly substantiated the Taxpayers' guilt. *See Bagnariol,* 665 F.2d at 889.

1973), and *United States v. Parshall*, 757 F.2d 211 (8th Cir.1985). *Walker*, 479 F.2d at 408–09, which involved a proffer of proof of an increase of $248,241 in taxpayer's net worth over a nine-year period, simply does not stand for the proposition cited by Taxpayers. *Parshall* is also distinguishable. There, the government introduced evidence that the taxpayer owed a substantial amount in taxes in order to show that taxpayer's failure to file income tax returns was willful. *See id.* at 213–14. The court held admissible in order to rebut the government's proffer expert testimony that the taxpayer's tax liability was much less than the government's estimate and that in fact the taxpayer was owed a tax refund. *Id.* Because the government here made no such proffer, *Parshall* has no bearing on this case.[2]

The court correctly excluded the expert testimony, stating that the effect would have been "[t]o use that [testimony] to extrapolate to another position, and that is, the [Taxpayers] believed they didn't have to pay taxes and that they were right in their belief...." The court's exclusion here accords with Fed.R.Evid. 704(b), which directs that "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto."[3] Thus, the accountant's testimony, if admitted, would have impermissibly stated an opinion as to the Taxpayers' willfulness, a mental state which is an element of the crime charged. *Id.* "Such ultimate issues are matters for the trier of fact alone." *Id.; accord, Langford*, 802 F.2d at 1179; *United States v. Windfelder*, 790 F.2d 576, 582 (7th Cir.1986).

■ The trial judge also excluded the accountant's testimony on Fed.R.Evid. 403 grounds. The trial judge believed that the accountant's testimony that Taxpayers did or did not have taxable income was a defense to the uncharged crime of tax evasion but was not relevant to the central issue in this case, Taxpayers' failure to file returns. Because there was no nexus here between the proffered expert testimony and Taxpayers' state of mind, the opinion was not relevant.

■ There is a further reason why the trial judge properly excluded the opinion. Expert testimony is properly admissible when it serves the purpose of "assist[ing] the trier of fact to understand evidence or to determine a fact in issue." Fed.R.Evid. 702; *Binder*, 769 F.2d at 602. In contrast, the accountant's testimony was offered to bolster Walter Brodie's credibility. Expert testimony may not appropriately be used to buttress credibility. *Binder*, 769 F.2d at 602. Expert testimony is properly excluded when it merely assesses the credibility of a taxpayer. *See Binder*, 769 F.2d at 602; *United States v. Brown*, 540 F.2d 1048, 1054 (10th Cir.1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977). "It is the jurors' responsibility to determine credibility by assessing the witnesses and witness testimony in light of their own experience. This is an area in which jurors did not need additional assistance." *Binder*, 769 F.2d at 602.

■ Taxpayers also attempted to call an attorney as an expert witness on the law of trusts. The attorney's testimony was proffered (1) to explain the nature of the ALA program, (2) to show that the foreign business trust organizations were valid business entities, and (3) to inform the jury that the validity of these trusts was legally unsettled during 1979 and 1980.

It is well settled that the judge instructs the jury in the law. Experts "interpret and analyze factual evidence. They do not testify about the law because the judge's special legal knowledge is presumed to be

---

2. Furthermore, *Parshall* carries little persuasive value because it relies on *United States v. Garber*, 607 F.2d 92, 99 (5th Cir.1979) (en banc), which has been repudiated by other courts. *See, e.g., United States v. Curtis*, 782 F.2d 593, 599–600 (6th Cir.1986).

3. Specific intent or willfulness is an element of a section 7203 violation. *See United States v. Windfelder*, 790 F.2d 576, 581–82 (7th Cir.1986).

sufficient, and it is the judge's duty to inform the jury about the law that is relevant to their deliberations." *United States v. Curtis,* 782 F.2d 593, 599 (6th Cir.1986).

The law would be in a curious state if jurors received their instructions on the law from an expert witness as well as from the trial judge. *See United States v. Ingredient Technology Corp.,* 698 F.2d 88, 97 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). Resolving doubtful questions of law is the distinct and exclusive province of the trial judge. *See United States v. Flitcraft,* 803 F.2d 184, 186 (5th Cir.1986). Expert testimony here would have been not only superfluous but mischievous.

## IV.

■ Taxpayers also contend that the evidence was insufficient to support the jury's verdict. On appeal, we, like the trial court, must determine whether, viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence from which the jury could reasonably find Taxpayers guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Poschwatta,* 829 F.2d 1477, 1478 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1024, 98 L.Ed.2d 989 (1988); *United States v. Marabelles,* 724 F.2d 1374, 1377 (9th Cir.1984).

The offense of failure to file an income tax return under section 7203 consists of three elements. The government must show that (1) Taxpayers were required to file a return, (2) they failed to file a return and (3) their failure to file was willful. 26 U.S.C. § 7203 (1982 & Supp. II 1984); *see Poschwatta,* 829 F.2d at 1481. In criminal tax violations, willfulness means "a voluntary, intentional violation of a known legal duty." *Poschwatta,* 829 F.2d at 1481; *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23–24, 50 L.Ed.2d 12 (1976) (per curiam); *United States v. Russell,* 804 F.2d 571, 574 (9th Cir.1986); *United States v. Dahlstrom,* 713 F.2d 1423, 1427 (9th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984). The

record demonstrates that the first two requirements under section 7203 have been satisfied: Taxpayers were required to file a return and failed to do so.

Taxpayers argue that the validity of the ALA tax shelter program was legally unsettled until 1982. However, the record shows that Taxpayers did not follow either the ALA program discussed in *Dahlstrom* and *Russell* or the program described by Bruce Ripley. At the heart of these tax avoidance schemes were three foreign trusts, which were to be established individually by the taxpayers. Income was transferred to and among these trusts, and was eventually transferred back to taxpayer participants as "gifts". Proponents of the ALA program claimed that because of the foreign status of these trusts, some of the transactions, including the purported gifts, were not subject to tax. *See Russell,* 804 F.2d at 574; *Dahlstrom,* 713 F.2d at 1425–26.

Taxpayers did not deposit their income into one of their overseas BTOs and have that income returned to them by another of the BTOs with a foreign citizen trustee. The participants in the ALA scheme were warned that money deposited directly into a domestic trust and then withdrawn would not accomplish legal tax avoidance. Disregarding this warning, Taxpayers deposited their income directly into their domestic bank accounts in Colorado and Nevada. Taxpayers paid their business and personal expenses directly from these accounts. None of the BTOs created by Taxpayers had a bank account, and none of Taxpayers' money was ever transferred to them.

The character of the trust attempted here resembles an anticipatory assignment of income (or a family trust), in which a taxpayer attempts to avoid the payment of taxes by assigning income to a trust or other entity. These schemes have been routinely disallowed since 1931. *See United States v. Basye,* 410 U.S. 441, 449, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973); *Russell,* 804 F.2d at 574; *Comer v. Davis,* 107 F.2d 355, 357 (5th Cir.1939). The illegality of the trust created by Taxpayers was completely settled: "It is well established that earned income is taxable to

those who earn it." *Comer*, 107 F.2d at 357; *Daugherty v. Commissioner of Internal Revenue*, 63 F.2d 77, 79 (9th Cir.1933) (stating that "fruits [should not be] attributed to a different tree from that on which they grew") (quoting *Lucas v. Earl*, 281 U.S. 111, 114–15, 50 S.Ct. 241, 241, 74 L.Ed. 731 (1930)); *see also Johnson v. United States*, 698 F.2d 372, 374 (9th Cir.1982).

Taxpayers' situation is distinguishable from that of the taxpayers in *Dahlstrom*. There, the government failed to provide any specific intent as to the taxpayers' violation of 18 U.S.C. § 371 (1982). In contrast, the government's case against Taxpayers established overwhelming evidence of their awareness of their duty to file income tax returns and their refusal to perform that duty. Taxpayers had not filed a return for over 15 years, and they had been convicted of failing to file returns less than two years before they embarked upon this offense. At their trial in 1977, Taxpayers were told that they had to file tax returns even if they did not owe any taxes.

In October 1979, Taxpayers told an IRS revenue agent that they were protesting the payment of taxes and reiterated their long-standing belief that they did not have to file because federal reserve notes were not legal tender. This contention is frivolous. Income tax laws are concerned with taxing "income" rather than legal "tender." *See United States v. Weir*, 679 F.2d 769, 770 (8th Cir.1982); *United States v. Whitesel*, 543 F.2d 1176, 1180–81 (6th Cir.1976), *cert. denied*, 431 U.S. 967, 97 S.Ct. 2924, 53 L.Ed.2d 1062 (1977). At the ALA meetings that Walter Brodie attended, he was specifically warned that the family trust system was illegal and had been condemned by the IRS and the courts; the ALA also provided Walter Brodie with a lengthy article from the Wall Street Journal discussing the illegality of family trusts at length. The government clearly met its burden of proof of demonstrating the willful failure of Taxpayers to file income tax returns. Therefore, when viewed in the light most favorable to the government, the evidence was sufficient to support a finding of specific intent to violate section 7203. *Dahlstrom*, 713 F.2d at 1427–28.

### V.

The Taxpayers next object to the trial court's refusal to give an instruction. Taxpayers cite *United States v. Freeman*, 761 F.2d 549, 551 (9th Cir.1985), *cert. denied*, 476 U.S. 1120, 106 S.Ct. 1982, 90 L.Ed.2d 664 (1986), for the proposition that an instruction should have been allowed because there was some evidence, although weak, on the record from which the jury might infer that Taxpayers entered into a separate property agreement. *Freeman* does not stand for the proposition. In *Freeman*, a defense was based on a first amendment claim. The court determined that "[w]here there is some evidence ... that the purpose of the speaker or the tendency of his words are directed to ideas or consequences remote from the commission of the criminal act, a defense based on the First Amendment is a legitimate matter for the jury's consideration." *Id.*

In an attempt to insulate Nancy Brodie from further prosecution, Walter Brodie claimed that all of their joint income belonged to him. Nancy Brodie attempted to argue that she had orally transmuted her community property interest in the income from the medical practice and that she therefore had no income for 1979 and 1980. The trial judge found that the evidence was insufficient to support a jury finding that the Taxpayers had executed a valid oral transmutation agreement and refused to instruct the jury on the effect of such an agreement. The court was right.

In order for an instruction on a particular defense to go to the jury, Taxpayers must present sufficient evidence to raise triable issues of fact on the elements of the defense. *United States v. Charmley*, 764 F.2d 675, 678 (9th Cir.1985); *United States v. Bowman*, 720 F.2d 1103, 1105 (9th Cir. 1983). "Where the evidence, even if believed, does not establish all of the elements of a defense ... the trial judge need not submit the defense to the jury." *United States v. Dorrell*, 758 F.2d 427, 430 (9th Cir.1985).

To be effective for federal tax purposes, the transmutation agreement must be valid under state law. *Schmitz v. Commissioner*, 52 T.C.M. (CCH) ¶ 83,482 at 2010, 2012 (1983); *Helvering v. Hickman*, 70 F.2d 985 (9th Cir.1934). California requires that the existence of the agreement be shown by clear and convincing evidence or by clear and decisive proof. *Schmitz*, 52 T.C.M. at 2012; *Somps v. Somps*, 250 Cal.App.2d 328, 58 Cal.Rptr. 304, 310 (1967). An oral transmutation agreement may be valid for some purposes provided it has been carried into effect. *See In re Marriage of Garrity/Bishton*, 181 Cal.App.3d 675, 226 Cal. Rptr. 485, 490 (1986). Execution is shown by acts and conduct in confirmation of the agreement. *Id.*

There was no evidence at trial that Taxpayers had agreed to transmute their property from community property to separate ownership. Their actions after the alleged agreement were not consistent with separate ownership of their property. Walter Brodie testified that he and his wife had an informal, general understanding that he would be responsible for their income in event of future prosecution. This bit of gallantry does not constitute a "transmutation" of property. Taxpayers worked full-time at the medical practice. Nancy Brodie had no source of income other than receipts from the medical practice. All of Taxpayers' bank accounts were joint accounts. Their receipts went into these joint accounts. Nancy Brodie paid for all of her living expenses by drawing checks on their joint accounts. Therefore, in the absence of any evidence that the Taxpayers attempted to transmute their presumptive community property to separate property under California law, it would have been error to impose upon the jury the Taxpayers' proposed instruction. *See Bowman*, 720 F.2d at 1105. The trial was free of reversible error.

AFFIRMED.