952 F.2d 408
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Neil T. NORDBROCK, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Evelyn R. NORDBROCK, Defendant-Appellant.
 Nos. 91-10014, 91-10015.
 United States Court of Appeals, Ninth Circuit.
 Submitted Dec. 11, 1991.*
Decided Jan. 9, 1992.
 
 Before CYNTHIA HOLCOMB HUG, HALL and O'SCANNLAIN, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Defendants Neil and Evelyn Nordbrock were convicted of filing false tax returns in violation of 26 U.S.C. § 7206(1). Both Defendants appeal, primarily arguing that there was insufficient evidence of specific intent to violate the tax laws. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction for this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.
 
 
 3
 * This case involves three tax returns: Defendants' 1981, 1982 and amended 1981 returns. Counts I and II alleged that Defendants' 1981 and 1982 returns were false because the returns did not include income from the sale of their accounting business and the lease of real property. Count III alleged that Defendants filed a false amended tax return for 1981 because it claimed zero taxable income.
 
 
 4
 In 1966, both Defendants moved to Tucson, Arizona and established an accounting practice. As a public accountant, Mr. Nordbrock did a substantial amount of tax return preparation. Mrs. Nordbrock was an "enrolled agent" with the Internal Revenue Service ("IRS").[1] Beginning in 1982, Mrs. Nordbrock was employed by Alpha Tax Service as a tax return preparer and office manager. She took at least one tax course through Alpha Tax Service.
 
 
 5
 In 1977, Mr. Nordbrock began attending American Law Association ("ALA") seminars conducted by Karl Dahlstrom. These seminars promoted a program involving the creation of foreign business trusts for the purpose of decreasing or avoiding tax liability. Ultimately, Mr. Nordbrock became a member on the board of directors for the ALA. The Ninth Circuit has described the Dahlstrom program as follows:
 
 
 6
 At these seminars, Dahlstrom ... instructed members on how to create foreign trust organizations (FTO's) in order to reduce their tax liabilities.... Members who implemented the ALA tax shelter program caused three trust organizations to be created in a foreign country by a citizen of that country. Typically, trust number one would be named trustee of trusts two and three, although the person implementing the FTO's retained complete control over all three trusts.
 
 
 7
 This tax shelter program contemplated that trust number two would be treated as a non-resident alien (purely for tax purposes) and would be subject to tax on payments from the user of the program. In order to reduce trust two's tax liability, purchasers of the program had trust two make payments to trust three. Payments made to trust three would not represent taxable income since trust three would be a foreign entity receiving income from a foreign source.
 
 
 8
 The final stage of this tax shelter program involved the return to the purchaser of some or all the money he paid to trust number two. In order to achieve this goal, a purchaser would have trust two borrow money from trust three and execute a demand note payable to trust three. Trust three would then transfer the demand note to the purchaser as a gift and the purchaser would demand and receive payment from trust two. This method was premised on 26 U.S.C. § 102 (IRC), which excludes gifts from gross income for income tax purposes, and IRC section 2501 which provides a gift tax exemption for gifts of intangible property by a non-resident alien to a citizen of the United States.
 
 
 9
 United States v. Dahlstrom, 713 F.2d 1423, 1425-26 (9th Cir.1983), cert. denied, 466 U.S. 980 (1984).
 
 
 10
 Pursuant to this program, the Nordbrocks traveled to the Turks and Caicos Islands in 1978 and created three foreign business trusts: Loon Trust Organization ("Loon"), Swan Business Organization ("Swan"), and Crane Company ("Crane"). Loon was the official trustee for Swan. Mr. Nordbrock, as trustee for Loon, appointed himself the "U.S. agent in administering the affairs of Swan." At the time of creation, Mr. Nordbrock allegedly transferred to Swan all the assets in his accounting practice, including good will and client lists, as well as his interest in the building in which the practice was located. The deed transferring this property, however, was not recorded until August 31, 1982.
 
 
 11
 Contrary to the financial maneuvers described in the program, the Nordbrocks did not transfer money from trust to trust, with the final transfer of money going from one trust to themselves. In 1981, $23,700 worth of checks were made payable to Neil Nordbrock from Swan's bank account. Moreover, a $1,000 check made out to Linda Maher was used to purchase an all-terrain motorcycle. The Crane Company bank account, of which the Nordbrocks were sole signatories, received a $10,000 check. Finally, Ruth Ashe, who held the mortgage on the building allegedly transferred to Swan, received checks totaling $5,087.83.
 
 
 12
 Checks totaling $20,962.53 were made payable to Neil Nordbrock during 1982. Ruth Ashe again received $5,087.83 from the Swan account. In addition, Clara Nordbrock, Mr. Nordbrock's mother, received checks totaling $2,228.52 drawn on the Swan account. Mr. Nordbrock used a $5,000 check payable to Valley National Bank to make a car payment on a loan. Finally, a $15,000 check was deposited in Swan's account at Shearson American Express. Mr. Nordbrock testified that he controlled the Swan account at Shearson.
 
 
 13
 Also in 1981, Mr. Nordbrock, on his own behalf and as trustee for Swan, sold half of the accounting business and leased one half of the building in which the business was located to David W. Goodman. The contract of sale stated that the building was "owned by seller and his wife, or their trust," and required Goodman to pay "Seller and his wife, or their trust," $750.00 per month as rent. The remaining one half interest in the accounting business was sold a few months later to David W. Goodman and C.W. Pyeatt, again on behalf of Mr. Nordbrock individually and as trustee for Swan. Mr. Nordbrock also leased the business property for a term of five years, with monthly payments of $1,500. In this second contract, Mr. Nordbrock agreed not to compete in the accounting business for a period of five years. Before the second half of the business was sold, Evelyn Nordbrock worked for Mr. Goodman. She prepared the rent checks for Goodman, making them payable to Swan. After the sale, however, most of these checks were payable to Neil Nordbrock.
 
 
 14
 Income from the sale of the business and the lease of the real property did not appear as taxable income on the Nordbrock's individual tax returns for 1981 or 1982. While Mr. Nordbrock claims to have reported this income on Swan's 1040NR (nonresident) return for tax years 1981 and 1982, an official Certification of Lack of Record reveals that the IRS did not receive any 1040NR returns for Swan for the taxable period of December 28, 1978 through 1988. The income received from the covenant not to compete appeared on both the 1981 and 1982 individual returns.
 
 
 15
 The government's summary witness testified that the unreported taxable income amounted to $22,111.95 in 1981 and $28,977.10 in 1982. In 1984, the Nordbrocks filed an amended tax return for 1981 (form 1040X) claiming that they were entitled to a $2,338 refund because they had zero taxable income. On the original 1981 return, the Nordbrocks claimed a taxable income of $21,376. The affidavit attached to the amended return stated that, after obtaining advice, attending lectures, and studying selected court decisions, they believed that they had no duty to pay income taxes, that the tax laws were invalid, and that personal income could not be taxed.
 
 
 16
 Mr. Nordbrock prepared all three returns at issue in this case. By the time he had prepared and filed the 1981 return, Karl Dahlstrom and four associates had been charged and convicted for activities relating to the program. By the time Mr. Nordbrock filed the 1982 and amended 1981 returns, the Ninth Circuit reversed the convictions, holding that because no precedent explicitly outlawed the techniques used in the Dahlstrom program, the evidence did not support a finding of specific intent to violate the tax laws. Dahlstrom, 713 F.2d at 1427.
 
 
 17
 The trial judge, sitting without a jury, found Mr. Nordbrock guilty on all Counts. He acquitted Mrs. Nordbrock on Counts I and II and found her guilty on Count III. The trial judge sentenced Mr. Nordbrock to five years of probation for each count, and Mrs. Nordbrock to three years probation. In addition, he prohibited both Defendants from counseling any person concerning revenue, ordered them to perform 500 hours of community service, fined them $10,000 each, and ordered them to pay $51,089.15, jointly, in restitution.
 
 II
 
 18
 We now turn to the merits of Defendants' appeal. Both Defendants challenge the sufficiency of the evidence supporting their convictions. In particular, they argue that the evidence did not demonstrate specific intent to violate the tax laws. Each Defendants' claim will be addressed separately.
 
 
 19
 To evaluate the sufficiency of the evidence, the reviewing court must determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could find the defendants guilty beyond a reasonable doubt. United States v. Brodie, 858 F.2d 492, 497 (9th Cir.1988).
 
 III
 
 20
 26 U.S.C. § 7206(1) punishes "any person who ... Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." To prove a violation section 7206(1), the government must show that
 
 
 21
 "(1) the defendant made and subscribed a return, statement, or other document that was incorrect as to a material matter; (2) the return, statement, or other document subscribed by the defendant contained a written declaration of perjury; (3) the defendant did not believe the return, statement, or other document to be true and correct as to every material matter; and (4) the defendant falsely subscribed to the return, statement, or other document willfully, with the specific intent to violate the law."
 
 
 22
 United States v. Marabelles, 724 F.2d 1374, 1380 (9th Cir.1984) (citations omitted).
 
 
 23
 Mr. Nordbrock challenges the sufficiency of the evidence with regard to the fourth element: specific intent to violate the tax code. Specific intent, or willfulness, is defined as the "voluntary, intentional violation of a known legal duty." Cheek v. United States, 111 S.Ct. 604, 610 (1991); see United States v. Pomponio, 429 U.S. 10, 12 (1976). A good faith misunderstanding of the tax code is evidence to be considered when determining willfulness. Cheek at 610. However, "a defendant's views about the validity of the tax statutes are irrelevant to the issue of willfulness." Id.
 
 
 24
 * Mr. Nordbrock contends that he lacked criminal intent because he followed the Dahlstrom program in good faith. We believe the record supports the district court's rejection of this argument. In fact, the evidence demonstrates that Mr. Nordbrock deviated from the program in two significant ways: (1) he did not file a 1040NR return for Swan, and (2) he did not transfer money among trusts according to the procedure advocated in the program.
 
 
 25
 Mr. Nordbrock testified that he filed 1040NR's for Swan for the tax years 1978-1982. Through Veronica Dougherty, a representative of the IRS Philadelphia Service Center,[2] the government introduced an Official Certification of Lack of Record indicating that the IRS had not received any tax returns for Swan for the taxable period of 1978 through 1982.[3] Ms. Dougherty also testified that she conducted a thorough search for any trace of a filing, but could find none. She described her search in detail, including each place she looked for evidence of a return. Specifically, she searched the nationwide computer, a non-master file, micro tapes, unit ledger cards, and every other place she knew a 1040NR might have been filed or recorded. Although Swan apparently applied for an Employer Identification Number ("EIN"), Ms. Dougherty testified that when an EIN is issued but not used, it is dropped from the system and no record will remain of that number. She also testified that the government does not issue inquiries when a taxpayer obtains an EIN but fails to file a return under that number.
 
 
 26
 Mr. Nordbrock contends that he presented sufficient evidence to discredit this testimony.[4] We disagree. On cross examination of Ms. Dougherty, Mr. Nordbrock elicited evidence that the IRS has had trouble locating 1040NRs, and that some 1040NRs filed during 1980-1985 had been destroyed. In addition, two defense witnesses testified that although they were told their clients' 1040NRs had either been lost or destroyed, the documents were finally discovered. Finally, Mr. Nordbrock testified that he applied for an EIN on behalf of Skagit Business Organization, and that unlike Swan, Skagit received numerous inquiries from the IRS concerning its failure to file.
 
 
 27
 Contrary to Mr. Nordbrock's assertions, this evidence is consistent with the inference that Swan never filed any 1040NRs. The testimony from the two defense witnesses demonstrates that the IRS can find documents if they are properly filed. In addition, even assuming that many documents were destroyed at the Philadelphia Service Center between 1980 and 1985, the fact that Ms. Dougherty was unable to find any evidence of returns filed between 1978 and 1980 rebuts any inference that the documents were filed and destroyed.
 
 
 28
 Essentially, Mr. Nordbrock argues that his witnesses and personal testimony were more credible than the government's. It is well settled, however, that questions of credibility are for the trier of fact, and that such determinations are given great deference by the reviewing court. United States v. Hodges, 770 F.2d 1475, 1478 (1985). Thus, the trial judge was free to, and apparently did, find Ms. Dougherty's testimony more worthy of belief than the defense witnesses.
 
 
 29
 Although the evidence regarding Skagit does raise a question as to why Swan didn't receive inquiries if it failed to file a return, it is insufficient to dilute the inference raised by Ms. Dougherty's testimony concerning her exhaustive search for any trace of the 1040NRs allegedly filed for Swan. That search would have uncovered tax returns filed prior to 1980 had they been filed.[5]
 
 
 30
 In addition to not filing Swan's 1040NR returns for 1981 and 1982, Mr. Nordbrock also failed to follow the method of transferring money as advocated in the Dahlstrom program. Contrary to the method contemplated by the program, the money in Swan's bank account was transferred directly to the Nordbrocks. The record demonstrates that money did not flow from Swan to Loon and Crane on a regular basis. Instead, a large number of checks were made payable to Mr. Nordbrock and other individuals, for the benefit of Mr. Nordbrock. Mr. Nordbrock was a member on the ALA's board of directors; he therefore must have been extremely familiar with the program, and conscious that his actions did not conform to those advocated by the ALA.[6]
 
 
 31
 Mr. Nordbrock contends that all money transferred to him were loans documented by promissory notes. We do not find Mr. Nordbrock's argument persuasive. The only evidence that the transfers were loans was Mr. Nordbrock's testimony and accounting sheets listing checks written to Mr. Nordbrock. Obviously, Mr. Nordbrock's credibility was essential to his argument, and the trial court apparently found his attempt to characterize the transfers as loans to be uncredible. Moreover, despite Mr. Nordbrock's claim that he has made interest payments on these loans, he did not claim any interest deductions on his tax returns for these payments. Finally, the fact that Nordbrock controlled Swan, and that Nordbrock admittedly did not have many assets, raises the strong inference that he had no intention to repay these loans. Thus, the evidence supports the trial court's conclusion that these transfers are not properly characterized as loans.[7]
 
 
 32
 The government correctly analogizes the present case to United States v. Brodie, 858 F.2d 492 (9th Cir.1988). In Brodie, this court held defendant taxpayers could not rely on the Dahlstrom program as evidence of lack of intent because they did not follow the program. Id. at 497. The court stated that "[t]he character of the trust attempted here resembles an anticipatory assignment of income ... in which a taxpayer attempts to avoid the payment of taxes by assigning income to a trust or other entity. These schemes have been routinely disallowed since 1931." Id. (citing United States v. Basye, 410 U.S. 441, 449 (1973)). Like the scheme in Brodie, the assignment of assets to Swan was nothing more than an anticipatory assignment of income in order to evade taxation. "It is well established that earned income is taxable to those who earn it." Brodie, 858 F.2d at 497-98 (quotation omitted). Thus, Mr. Nordbrock cannot argue that he lacked specific intent to violate the tax laws.
 
 B
 
 33
 Mr. Nordbrock also argues that he lacked specific intent because he did not know the program was a sham and because he relied on the advice of counsel. At the time he filed the 1981 tax return, however, Dahlstrom and four associates had been convicted of several counts of tax fraud. By the time he filed the 1982 return, the Ninth Circuit had reversed the convictions because the government did not prove that defendants acted with specific intent. See Dahlstrom, 713 F.2d at 1427-28. Mr. Nordbrock's reliance on this reversal to prove lack of intent is misplaced. As the trial court pointed out, the court "did not decide that the Dahlstrom scheme was legal, but only held that the government failed to prove the requisite intent." Unlike the defendants in Dahlstrom, Mr. Nordbrock acted in the face of pronouncements indicating the illegality of the scheme. Mr. Nordbrock did not seek independent legal advice, but instead chose to file his tax returns without including the income from the sale and lease as part of his taxable income.
 
 
 34
 Mr. Nordbrock's alleged reliance on advice of counsel does not support his contention that he lacked specific intent. The testimony from these individuals related only to the Dahlstrom program, not to Mr. Nordbrock's activities, which deviated from the Dahlstrom scheme. In addition, reliance on counsel is evidence of good faith only if the advice was obtained after full disclosure of all relevant facts. See United States v. Conforte, 624 F.2d 869, 877 (9th Cir.), cert. denied, 449 U.S. 1012 (1980). The record does not reveal, however, that Mr. Nordbrock made such a disclosure because the testimony related solely to the mechanics of the Dahlstrom Program--a program Mr. Nordbrock did not follow.
 
 
 35
 Thus, we find that viewed in the light most favorable to the government, the evidence was sufficient to support the trial court's finding of specific intent as to Counts I and II.[8]
 
 IV
 
 36
 Defendants next contend that the evidence was insufficient to support their convictions on Count III because it did not demonstrate that the amended return was false as to a material matter or that either Defendant acted willfully. Defendants' arguments are unpersuasive.
 
 
 37
 * The materiality of a statement is a question of law. United States v. Flake, 746 F.2d 535, 537 (9th Cir.1984), cert. denied, 469 U.S. 1225 (1985). In United States v. Holland, 880 F.2d 1091, 1096 (9th Cir.1989), this court held that "any failure to report income is material." The amount by which unreported income exceeds reported income is irrelevant to the materiality determination. Id. at 1095-96. Thus, the amended return was false as to a material matter.
 
 
 38
 Defendants attempt to evade the pronouncement in Holland by arguing that the amended return is not material precisely because their "position was so frivolous" that no one would have accepted the refund claim. Relying on United States v. Dorotich, 900 F.2d 192, 194 (9th Cir.1990), Defendants argue that the materiality element requires "statements which are intended to deceive and/or defraud the government." Dorotich does not control this case, however, because contrary to Defendants' assertions, it does not address the issue of materiality under section 7206(1).
 
 B
 
 39
 With regard to Mrs. Nordbrock, Defendants argue that the evidence did not establish specific intent because the evidence used to demonstrate specific intent was the same for all three counts. Specifically, they argue that because the trial court found that she was "merely a passive signer" on the 1981 and 1982 returns, she was also a passive signer in the amended return.
 
 
 40
 Several facts support the trial court's finding that Mrs. Nordbrock acted with specific intent. First, unlike the 1981 and 1982 returns, the amended return contained a lengthy affidavit describing why both Defendants did not believe they owed any income tax. Because affidavits normally are not attached to a tax return, it is likely that Mrs. Nordbrock took notice of the affidavit's contents and the statements in the amended return. The fact that Mr. Nordbrock usually directed her only to sign the tax form does not preclude the possibility that she read the form on this occasion. Thus, her signature on the affidavit supports the inference that she was not passively signing the amended return.
 
 
 41
 Second, Mrs. Nordbrock's career in the tax field supports the inference that she read the document and knew the return was false. Mrs. Nordbrock was an enrolled agent for the IRS; to attain this position, she was required to pass a two day examination on the tax laws. Moreover, while working for Alpha Tax Service as a tax return preparer, Mrs. Nordbrock attended at least one class concerning the filing of returns.
 
 
 42
 With regard to Mr. Nordbrock, Defendants' arguments are similarly unpersuasive. Mr. Nordbrock claims that he filed the amended return as the first step in bringing a refund suit. The trial court, however, was free to disbelieve this statement, especially in light of the fact that Mr. Nordbrock did not pursue his claim by filing a civil suit. Like Mrs. Nordbrock, Mr. Nordbrock's background as a tax preparer made it likely that he knew the requirements of the law, and that the amended return did not comply with these mandates.
 
 
 43
 Mr. Nordbrock also claims that he lacked specific intent because he truly believed that the IRS could not lawfully tax income. The Supreme Court rejected this argument in Cheek, 111 S.Ct. 604, 613 (1991). There, the Court held that "a defendant's view about the validity of the tax statutes are irrelevant to the issue of willfulness...." Id. As the court noted, there is a distinction between a good faith misunderstanding of the law and a good faith belief laws are invalid; the former can negate willfulness while the latter cannot.
 
 
 44
 Viewing this evidence in the light most favorable to the government, we find that the evidence supports Defendants' convictions with respect to Count III.
 
 V
 
 45
 As a last-ditch argument, both Defendants argue that Count III failed to charge an offense because "as a matter of law, challenges to the tax laws do not constitute an offense when Congressionally mandated procedures are followed...." The proper way to challenge the tax laws is "to pay the tax that the law purported to require, file for a refund, and, if denied, present [their] claims of invalidity." Cheek, 111 S.Ct. at 613. Defendants claim that their amended tax return was a claim for a refund, and therefore their activity cannot be condemned.
 
 
 46
 The government is correct that this argument is frivolous. The fact that their amended return includes a refund request does not immunize Defendants from prosecution for filing a false amended return. Moreover, Defendants did not follow the prescribed avenue for challenging the tax laws, rendering reliance on Cheek unhelpful. Although Defendants filed a return, paid the tax and filed for a refund, they did not present their claims of invalidity to the courts once the refund was denied. In fact, Defendants have never pursued this final step in challenging the tax laws. In Cheek the Court stated that "We do not believe that Congress contemplated that such a taxpayer, without risking criminal prosecution, could ignore the duties imposed upon him by the Internal Revenue Code and refuse to utilize the mechanisms provided by Congress." Cheek, 111 S.Ct. at 613.
 
 VI
 
 47
 We hold that the evidence was sufficient to support Defendants' convictions, and that Count III properly charged an offense. The district court is therefore AFFIRMED.[9]
 
 
 
 *
 The panel unanimously finds this case suitable for submission on the record and briefs without oral argument. Fed.R.App.P. 34(a), Ninth Circuit R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit R. 36-3
 
 
 [1]
 Enrolled agents are authorized to represent taxpayers in particular proceedings before the IRS. 26 C.F.R. 601.502(b)(1)(iii). These individuals are required to take a two day examination on the tax laws to become an enrolled agent
 
 
 [2]
 1040NRs must be filed in the Philadelphia Service Center
 
 
 [3]
 Mr. Nordbrock claims that the Certification is "treble hearsay" which should have been excluded. Mr. Nordbrock is wrong. In United States v. Neff, 615 F.2d 1235, 1241 (9th Cir.), cert. denied, 477 U.S. 925 (1980), this court held that an IRS Certificate demonstrating that the defendant had not filed proper tax returns was admissible under Rule 803(10) of the Federal Rules of Evidence. Id. Rule 803(10) allows a party to prove the absence of a record, report, statement or data compilation through "evidence in the form of a certification in accordance with rule 902, or testimony, that diligent search failed to disclose the record, report, statement or data compilation, or entry." Fed.R.Evid. 803(10). Both the Certification and Ms. Dougherty's testimony reveal that the IRS conducted a thorough and diligent search for the documents. As such, the Certification is admissible under Rule 803(10)
 The cases upon which Mr. Nordbrock relies do not support his position. In United States v. Buford, 889 F.2d 1406, 1408 (5th Cir.1989), the court held that the district court erred by failing to conduct an in camera review of defendant's Individual Master File (IMF) because two documents admitted into evidence contained information from the IMF. Contrary to Mr. Nordbrock's interpretation, the court did not hold that a Certificate of Assessments prepared for trial is admissible only if there is no objection. Similarly, in United States v. Hesse, 1990 WL 6562 (S.D.N.Y.1990) (unpublished), the district court held that although the certificate was secondary evidence as to a disputed issue, it was nonetheless admissible.
 
 
 [4]
 Mr. Nordbrock alleges that the "government was unable to prove via lab test that the Swan 1040NR's for 1981 and 1982 were not prepared at or about the time the Nordbrocks claim they were filed." This is incorrect. The laboratory test established only that the alleged "original copy" of Swan's 1040NR was consistent with xerox copies, both of which Defendant gave to the government. Because it did not establish the date of preparation, the test does not rule out the possibility of recent fabrication
 
 
 [5]
 Mr. Nordbrock argues that the government failed to comply fully with the trial court's discovery order requiring it to produce every document not protected by Brady. Pursuant to the trial court's July 17, 1989 order, the government conducted a search for Brady material, but found nothing. Thus, Mr. Nordbrock's assertion that the government has Brady material but has failed to produce it is nothing more than mere speculation. This is not enough to order the government to disclose documents in its possession. United States v. Michaels, 796 F.2d 1112, 1116 (9th Cir.1986), cert. denied, 479 U.S. 1038 (1987)
 Mr. Nordbrock also accuses the government of failing to comply with an order requiring the government to turn over documents relating to specific subpoenas. Mr. Nordbrock's accusation is a mischaracterization of the record; the government was sanctioned by the trial court because it failed to comply with the order in a timely fashion, not because it failed to comply altogether.
 
 
 [6]
 Mr. Nordbrock filed a supplemental citation of authority, urging that this court's decision in United States v. Powell, 936 F.2d 1056 (9th Cir.1991), supported his argument that he did not willfully violate the tax laws because he subjectively believed he was following the Dahlstrom program. Powell held that a "defendant must demonstrate only that a subjective good faith belief is held and not that the belief [is] also ... objectively reasonable." Id. at 1062. Powell does not help Mr. Nordbrock because the trial court's decision demonstrates the application of the subjective standard. The trial court made specific findings that Mr. Nordbrock did not believe that he was following the Dahlstrom program or that the scheme he used was lawful
 
 
 [7]
 Even if true, the existence of such loans does not prove that Mr. Nordbrock followed the Dahlstrom Program or that he kept his private financial affairs separate from Swan's. Rather, the loans create the inference that the trust was used to transfer income and avoid the assessment of income taxes
 
 
 [8]
 Mr. Nordbrock's argument that the trial court erred by failing to discuss all of the evidence he presented in rebuttal is meritless. In denying Mr. Nordbrock's renewed motion for judgment of acquittal, the district court explicitly stated that it had considered all the evidence
 
 
 [9]
 For the first time in their reply brief, Defendants allege first amendment and due process violations. These allegations are not discussed clearly and are buried in the argument and conclusion. We decline to address them. See State of Nevada v. Watkins, 914 F.2d 1545, 1560 (9th Cir.1990), cert. denied, 111 S.Ct. 1105 (1991)